**Marta E. ROSS, Plaintiff,**

v.

**WILLIAM BEAUMONT HOSPITAL, Gerald S. Wilson, M.D., John W. Murphy, M.D., Jointly and Severally, Defendants.**

**Civ. A. No. 86–CV–70082–DT.**

United States District Court,
E.D. Michigan, S.D.

Jan. 15, 1988.

Thomas G. Rollins, Detroit, Mich., for plaintiff.

Terence V. Page, Birmingham, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

From January 14, 1987 until March 13, 1987, this Court conducted a trial in the instant cause. The Complaint of the Plaintiff, Marta E. Ross, set forth several causes of action, including a Title VII claim for sex discrimination, 42 U.S.C. § 2000e *et seq.*, against the Defendants, William Beaumont Hospital (Beaumont), Gerald S. Wilson and John W. Murphy. All of her claims except the Title VII issue were submitted to the jury for a verdict. However, the jury was asked to render an "Advisory" verdict on her Title VII claim.[1]

On March 13, 1987, the jury rendered its verdict.[2] In addition, the jury answered "no" to the advisory verdict question "Did any of the Defendants discriminate against the Plaintiff on the basis of her sex, in violation of the federal law (42 U.S.C. § 2000)?" The jury also answered "no" to the question "Did any of the Defendants discriminate against the Plaintiff on the basis of her sex, in violation of the state law (Michigan Civil Rights Act)?" The jury used the same legal standard for the advisory verdict under Title VII and the state law discrimination claim.[3]

This Court must now resolve the Title VII issue and, particularly, whether the Defendants discriminated against her on the basis of sex, in violation of 42 U.S.C. § 2000e–2. Pursuant to *Fed.R.Civ.P.* 52(a), this Court will now enumerate its findings of fact, conclusions of law, and the basis for the jurisdiction of the Court over the issues and the parties.

### I

A charge of discrimination against the Defendants was timely filed with the Equal

---

1. Pursuant to 42 U.S.C. § 2000e–5, there is no right to a trial under Title VII. *See e.g. Cox v. Athena Cablevision,* 558 F.Supp. 258 (E.D.Tenn. 1982). Advisory verdicts are permitted by *Fed. R.Civ.P.* 39(c).

2. The jury answered (1) "yes" to the question as to whether any of the Defendants discriminated against Ross on the basis of her handicap in violation of federal and state law (second claim); (2) "yes" to the question as to whether any of the Defendants discriminated against Ross on the basis of her weight (third claim); (3) "no" to the question as to whether Murphy and Wilson conspired to discriminate against Ross on the basis of her sex, weight, or handicap (fourth claim); (4) "no" to the question of whether the Defendants breached the terms of an implied contract that Ross' staff privileges would not be revoked in the absence of just cause (fifth claim); and (5) "yes" to the question as to whether any of the Defendants intentionally or wrongfully interfered with Ross' relationship with Beaumont (sixth claim).

3. Use of the same legal standard has been expressly authorized. *See e.g. Rabidue v. Osceola Refining Co.,* 584 F.Supp. 419, 426 (E.D.Mich.), *cert. denied,* — U.S. —, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). However, this Court does not believe that the jury's verdict on the state discrimination claim precludes it from independently examining the discrimination issue under Title VII. The prohibition of a jury trial under Title VII cannot be so easily circumvented.

Employment Opportunity Commission by the Plaintiff, Marta E. Ross, on November 20, 1985. Approximately, five weeks later (December 24, 1985), the Equal Employment Opportunity Commission issued a Notice of Right to Sue to her. This lawsuit was filed on January 7, 1986. Consequently, the various jurisdictional prerequisites of Title VII have been fully satisfied. The Plaintiff has also maintained a claim under 29 U.S.C. § 794.

Thus, this Court has jurisdiction over the parties and the subject matter, pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331, as well as under the principles of pendent jurisdiction.

## II

### A

The parties have stipulated to the following facts which this Court adopts and incorporates into its findings of facts:

1. Ross, Wilson and Murphy are residents of the State of Michigan.

2. Beaumont is a Michigan non-profit corporation with its principal place of business in the State of Michigan.

3. Ross, Wilson and Murphy were medical doctors with licenses to practice medicine in the State of Michigan at all times that are relevant to these proceedings.

4. Ross completed a surgical residency at Beaumont in 1975 and completed a fellowship in surgical transplantation at the University of Colorado Medical Center in 1976.

5. In 1978, Ross obtained staff privileges as an attending staff physician in the General Surgery and Peripheral Vascular Surgery Departments at Beaumont in Troy.

6. On July 29, 1982, Ross requested a medical leave of absence.

7. During the course of her medical leave of absence in the fall of 1982, Ross was diagnosed as having narcolepsy and began treatment for that condition.

8. On September 14, 1982, Ross' medical leave of absence was terminated.

9. On the same date, Ross was placed on probationary status for six months.

10. In November of 1982, Ross was diagnosed as having suffered a broken leg and began treatment for that condition.

11. Ross was removed from probationary status by the Medical Executive Board on April 5, 1983.

12. On February 5, 1985, Ross was required to arrange an appointment with Dr. Russell Smith, Medical Director of Brighton Hospital.

13. Ross was examined by Smith on February 26, 1985.

14. On May 23, 1985, Ross' staff privileges at Beaumont were suspended by Wilson.

15. On May 28, 1985, the Medical Executive Board at Beaumont approved Wilson's recommendation that Ross' staff privileges be terminated.

16. On June 3, 1985, the Executive Committee of the Board of Trustees of Beaumont concurred with the Medical Executive Board's recommendation to terminate Ross' staff privileges.

17. On August 27, 1985, Ross met with a Beaumont Appeals Committee, whose members were requested to serve by Wilson, for the purpose of appealing the termination of her staff privileges.

18. In a letter, dated September 27, 1985, Wilson notified Ross that (a) the Medical Executive Board at Beaumont affirmed its recommendation to terminate her staff privileges, (b) the Joint Conference Committee of the Board of Trustees affirmed its decision to terminate her staff privileges, and (c) the Board of Trustees affirmed its decision to terminate her staff privileges.

19. At no time relevant to the events herein, did (a) Ross' rate of infections incidental to surgery deviate from accepted limits and such was

not the reason for the termination of her staff privileges, (b) Ross' rate of morbidity and mortality for her patients deviate from accepted limits and such was not the reason for the termination of her staff privileges, and (c) any act of Ross result in any negligence or malpractice action against Beaumont.

20. Dr. Steven D. Rimar joined Murphy's medical practice as an employee in 1985.

21. Rimar is currently receiving training in a fellowship program in vascular surgery.

22. Ross was, at all times relevant to this controversy, the only female vascular surgeon with staff privileges at Beaumont.

23. Ross filed a charge of discrimination against the Defendants with the Equal Employment Opportunity Commission and with the Michigan Department of Civil Rights.

### B

This is an extraordinarily convoluted sex discrimination case wherein Ross claims that her staff privileges at Beaumont were illegally terminated.

During the period when Ross had staff privileges at Beaumont (1978–1985), Wilson was the Chief of Staff, as well as a staff member, of Beaumont. During that same period, Murphy was the Chief of the Department of Surgery at Beaumont, as well as a member of its staff. Beaumont owns and operates two hospitals in the Greater Detroit, Michigan area. The Hospital, which is relevant to this case, is located in Troy.[4] The other Hospital is situated in Royal Oak.[5]

The general corporate structure of Beaumont is set out in the "Corporation Bylaws" (Amended and Restated), October 29, 1984).[6] However, the more important document for the purposes of this proceeding is the "Bylaws, Rules and Regulations of the Medical and Dental Staff of William Beaumont Hospital—Troy."[7] Article III, Section 6, "Termination of Privileges," sets forth the procedures for the termination of staff privileges at the Hospital:

> The Chief of a Service or the Chief of Staff may summarily suspend any or all privileges of any Staff member if in his professional judgment such action is in the best interest of a patient or the Hospital. Within 48 hours after any such suspension, it must be confirmed or rescinded by the Chief of Staff and, if confirmed, the matter will be referred to the Medical Executive Board at its next meeting. Temporary suspension for failure to complete medical records or for non-medical reasons will not be reported to the Medical Executive Board. The Medical Executive Board at that time may rescind the suspension or approve a recommendation for permanent termination of privileges, impose such intermediate sanction as the circumstances, in its judgment, merit or recommend appropriate disciplinary action. If the Staff member does not request a hearing to appeal an adverse recommendation, the recommendation will be forwarded to the Joint Conference committee and to the Board of Trustees.

(Emphasis added). This provision sets forth the standards which governed Wilson's decision to suspend Ross' privileges.

This Court notes that Ross and Wilson were not always adversaries. The testimony at trial revealed that, inasmuch as it was a relatively new and public non-profit Hospital, Beaumont required surgeons who sought to practice in the difficult area of peripheral-vascular surgery to have some substantial training in the area. Ross sought to practice in that area. She was informed by Wilson of her necessity to

---

4. Unless specified otherwise in this Opinion, references to Beaumont will apply only to the Beaumont Hospital facility in Troy, Michigan.

5. Wilson's position as Chief of Staff and Murphy's position as Chief of the Department of Surgery relate only to the Beaumont Hospital facility in Troy, Michigan.

6. Defendants' Exhibit 4.

7. Ross' Exhibit 00.

obtain additional experience which Beaumont could not provide at that time.

On September 2, 1977, Wilson assisted Ross in acquiring the requisite experience by writing a letter on her behalf to an associate of Dr. Denton Cooley, who was purportedly one of the world's leading heart surgeons.[8]

During the trial, Ross testified that she was (1) unaware of any rule at Beaumont which required additional training[9] and (2) Wilson's letter was of little, if any, benefit in her gaining the position. She said of her efforts:

> He wrote a letter or something. But then I never heard. I never heard. So, I finally called Dr. Starzyl, because I knew Dr. Starzyl knew Dr. Cooley. And Dr. Starzyl called Dr. Cooley, and then I got notification that I could come down there.[10]

Despite Ross' comments, the evidence is quite clear that Wilson wrote a very favorable letter of reference on her behalf.

After she began at Beaumont, and for many years afterwards, virtually everyone held her technical skills as a surgeon in high repute. Moreover, there was abundant testimony about her willingness to work long hours, and perform beyond the average number of operations.

However, throughout her tenure at Beaumont, there were numerous complaints about her behavior, especially toward the nursing staff and patients. Other major concerns included her falling asleep at inappropriate times due to narcolepsy, as well as an alleged weight problem.

▉ This Court will now present the balance of its findings of fact by dividing Ross' tenure at Beaumont into four stages, based on the disciplinary actions which she experienced at Beaumont.

Ross' personnel file contains many reports which described her allegedly abusive behavior by her to nurses and patients during her first three years at Beaumont. No disciplinary action was taken against her until August 24, 1981.[11] On that date, the Defendants put her on six month probation because they believed that her abusive behavior to nurses and other paramedical personnel harmed the efficient administration of the hospital. Ross strongly disagrees with these assertions, claiming that her sex played a key role in the probation.[12]

This first probationary period was terminated by the Defendants prior to the end of the original six month period. In a letter, dated November 21, 1981, Murphy wrote to Ross:

> In the recent past I have received two communications from Nursing Staff commending you on your relationships with nursing personnel.
>
> I wish to take this opportunity to thank you for your cooperation in regards to this matter and also to inform you, as I did the other day, that the probation on

---

8. Wilson's letter stated in part:
   She performed very well, being an outstanding resident at William Beaumont Hospital, receiving excellent recommendations from Doctor Staryzl in Colorado, and actually was offered a position at Ford Hospital.... Although Doctor Ross is an excellent technician and is very knowledgeable about transplant surgery, she has not had formal observation or training in peripheral-vascular surgery.... Of course, please accept this as a strong recommendation for Doctor Ross's acceptance.

9. No solid evidence beyond mere conjecture was ever presented to contradict Wilson's contention that the rule was a policy at Beaumont.

10. Transcript, Ross, February 6, 1987, 161–162.

11. Ross' personnel file is Defendants' Exhibit 5. This Court determined at trial that although the materials in the file could not be used to prove the truth of the matters asserted therein, they would be admitted to identify the reports that Wilson relied upon in deciding to terminate Ross. In so ruling, this Court does not conclude that these reports were true renditions of events. They simply help show Wilson's motive in deciding to terminate.

12. Personnel file reports (i.e., May 5, 1981, May 31, 1981 and July 2, 1981) formed a basis for Wilson's decision to terminate Ross. They suggest that she was rude to nurses. In September 1981, the nurses ranked Ross as the most difficult surgeon with whom they had to work. Ross attacks these reports for reasons be discussed.

which you have been placed is lifted as of this date, 11/21/81.

Ross' next difficulty occurred on July 28, 1982 when she was required by Wilson to request a medical leave of absence.[13] In support of his decision, Wilson testified that he relied on various Beaumont reports which indicated that Ross had fallen asleep in the operating room and during various Hospital meetings. He added that her leg problem, which necessitated the use of a walker, and grossly overweight condition caused him to worry about whether she would have difficulty in performing surgery. Finally, Wilson opined that these problems, when viewed collectively, made things unsafe for the care of her patients in the operating room, requiring his immediate action.[14]

As a condition for returning to the Beaumont staff, Wilson required Ross to obtain specific medical treatment for her physical problems. He memorialized this requirement in an August 16, 1982 memo to Ross:

The following conditions are requested prior to your resuming full active surgical practice at William Beaumont Hospital Troy.

1. A letter from two (2) neurologists concerning your sleeping problem to include the diagnosis, suggested therapy, and when it is safe for your patients that you return to active surgical practice.

2. Evaluation and treatment of your obesity by a physician approved by the hospital with a letter from him indicating when your weight loss is sufficient to allow you to carry on your surgical practice. I would suggest Doctor Charles Lucas, Doctor Jose Yanez or a specialist in metabolic disease of similar caliber.

3. A letter from a psychiatrist indicating you are under therapy and when you are well enough to return to active surgical practice.

4. A letter from the physician treating your knee problem indicating when you are able to return to active surgical practice.

All four of the above stipulations are to be completed before consideration will be given to reinstating your surgical privileges.

On August 4 and 5, Drs. David Lustig and Sami Mounayer, who had diagnosed Ross' sleeping problems as being caused by narcolepsy, forwarded letters to Wilson, in which they collectively opined that their prescribed medication would control her medical problem.[15]

On August 21, 1982, Ross' psychiatrist advised Wilson by letter that she was under his treatment. On August 25, 1982, a surgeon transmitted a letter to Wilson regarding Ross' knee condition. Approximately two weeks later (September 8, 1982), another physician Wilson wrote regarding his treatment of Ross' weight problem.

Believing that she had satisfied all of Wilson's requirements, Ross requested reinstatement to the Beaumont staff. Her request was granted as of September 15, 1982, subject to certain probationary conditions: [16]

You will be placed on probation for six months, during which time you will be expected to:

1. Remain alert during operative procedures.

2. Provide a monthly letter from the physician treating your obesity indi-

---

**13.** This leave of absence represented a forewarning to Ross since she was told of Beaumont's concerns about her health in April 1982 during a meeting with Wilson and Hutchins.

**14.** Although Ross acknowledged her knee and sleeping problems, she asserted that these maladies never affected the care of her patients.

**15.** Prior to his receipt of the letters from Ross' treating physicians, Wilson thought that she had

"Pickwickian Syndrome." The name, "Pickwickian Syndrome," is derived from the Dickens character. It is not a disease or an illness. Rather, it is a physical condition which is based on the concept that a very heavy person's weight can press down on her diaphragm and cause sleep.

**16.** Letter from Wilson, dated September 15, 1982.

cating that you are losing weight as per his recommendation.

3. Maintain an acceptable behavior pattern at the Beaumont–Troy Hospital.

4. Meet with the Chief of Staff monthly to review your progress.

During the next several months, Ross had reasonably regular meeting with Wilson, and often with Hutchins, at which time her progress at Beaumont was reviewed. Wilson opined that Ross was generally meeting the terms of her probation, which he believed to be necessary in order to ensure that she was capable of giving the necessary quality of care to the Beaumont patients.[17] During this probationary period, Ross discovered that her leg problem had been misdiagnosed. It was not mere tendonitis. Instead, a new x-ray revealed that the source of her leg problem was a fractured tibia which dated back to June 1982.[18] Thereafter, she wore a cast from her groin to her toes.[19] This third stage of her case lasted until April 20, 1983 when she was taken off probation.

In April 1983, Wilson, after reviewing Ross' progress during the probationary period, concluded that she had satisfied the terms of her probation. Hence, in an April 20, 1983 letter, Wilson advised Ross that her probation had been lifted:

At the Medical Executive Board meeting of April 5, 1983, it was approved that you be removed from probationary status but that the guidelines as outlined in the probationary period and enumerated below be continued for an indefinite period of time:

1. That you remain alert during operative procedures,

2. That you provide a monthly letter from the physician treating your obesity indicating that you are losing weight as per his recommendation,

3. That you maintain an acceptable behavior pattern at the Beaumont Troy Hospital,

4. That you meet with the Chief of Staff monthly to review your progress, and

5. That, if there is evidence that the above conditions are not being followed, you will be subject to disciplinary action.

Over the next two years, numerous incident reports about Ross' disruptive behavior were added to her personnel file. During this period, Wilson met with Ross on several occasions and sought to get her to substantially modify her behavior toward the patients and staff.[20]

As time passed, Wilson concluded that Ross' relationship with others within the Beaumont community had substantially deteriorated once again. On February 5, 1985, he authored a letter to Ross, in which he wrote:

Due to your continued disruptive behavior, your physical handicap apparently caused by extreme obesity, and your falling asleep at inappropriate times, you are requested to arrange an appointment with Doctor Russell Smith, Medical Director of Brighton Hospital . . . and have him provide me with his diagnosis of your mental and physical health status, his suggestion for any necessary treatment, and his opinion as to whether you are physically and emotionally fit to carry on the practice of surgery.

---

**17.** The necessity or value of the probation was not shared by Ross who felt that was demeaning and unnecessary.

**18.** Transcript, Ross, February 17, 1987, at 118. She subsequently fractured her left fibula which Ross advanced as a justifiable explanation for her difficulty in walking.

**19.** *Id.* at 119. *See* Ross' Exhibit (December 13, 1982) (her knee in cast). The record indicates that she had a cast on her leg until June 30, 1983.

**20.** Defendants acknowledge that Ross was the first medical doctor upon whom they had ever imposed indefinite guidelines. However, as a justification, they cited the potential danger (e.g. falling asleep while attending to her medical obligations at Beaumont) to patients. Ross strongly disputes this rationale. Wilson and Murphy claim that they expressed praise to Ross whenever the circumstances warranted it.

Failure on your part to meet such an appointment within one month of this date will result in a recommendation to the Medical Executive Board to suspend your staff privileges.

Although denying Wilson's assessment, Ross did visit with Smith [21] who recognized her problems but opined that over an extended period of time and with much support, she could become a mature surgeon.

In late spring of 1985, Wilson, after assessing Ross' progress since the termination of her probationary status, concluded that Ross' problems continued to increase. Thus, on May 23, 1985, he sent her the following letter:

Your appointment on the Medical staff of William Beaumont Hospital–Troy is suspended effective as of this date because of repeated instances of failure to comply with the guidelines in a letter to you on April 20, 1983 ... particularly your inability or unwillingness to "maintain an acceptable behavior pattern" and your failure "to provide a monthly letter from the physician treating your obesity." This decision is based upon my professional judgment and such action is being taken in the best interest of the Hospital and its patients.

Thereafter, Wilson submitted his recommendation (to wit, that Ross' staff privileges be terminated) to the Beaumont Medical Executive Board.[22] His recommendation was approved on May 28, 1985. On June 3, 1985, the Executive Committee of the Beaumont Board of Trustees concurred in the decision of the Medical Executive Board. Ten days later (June 13, 1985), Wilson transmitted a letter to the Michigan Department of Licensing and Regulation which read:

Please be informed that the William–Beaumont staff privileges of Dr. Marta Ross were terminated by the Board of Trustees on June 3, 1985 because of disruptive behavior and failure to adhere to certain guidelines.

After extensive administrative hearings, the Beaumont Appeals Committee voted on August 29, 1985 to recommend that Ross be terminated from the Hospital staff because of "her disruptive behavior," with an opportunity to voluntarily resign. Thereafter, in succeeding but separate decisions, the Medical Executive Board and the Executive Committee of the Joint Board of Trustees affirmed the decision to terminate Ross' staff privilges.

On July 2, 1986, Ross reapplied for staff privileges at Beaumont. However, her application was rejected. Ross asserts that she was replaced by a white male surgeon. The trial evidence on this point is not clear. Ross made reference to Dr. Steven D. Rimar, who, according to the evidence at trial, was granted staff privileges in March of 1985—prior to Ross' termination. However, Rimar did not join the Hospital as a staff member until the completion of his residency in July 1985 after Ross' termination. He left Beaumont in January of the following year to the apparent consternation of Murphy. It appears that Rimar was not hired to serve as a peripheral-vascular surgeon. He was picked to do general surgery.[23] In contrast, Ross focused on peripheral-vascular surgery as well as general surgery.

Two other doctors require mentioning. Dr. Kitzmiller was admitted to practice peripheral-vascular surgery at Beaumont in October 1982. Dr. Tuma also received staff privileges as a peripheral-vascular surgeon. Murphy contends that Tuma received staff privileges in "either late '84 or '85. I'm not sure of the exact date." [24] In response to a question from Ross' counsel as to whether Tuma received staff privileges on or about the date that Ross lost

**21.** Smith is well known within the metropolitan Detroit area as a counselor to physicians with emotional difficulties.

**22.** Ross vigorously took issue with Wilson's conclusions, arguing that it was filled with gross inaccuracies and was merely a pretext for the Defendants' acts of discrimination.

**23.** Transcript, Murphy, February 2, 1987, at 30. Kitzmiller's first name is not revealed in the record.

**24.** Transcript, Murphy, January 29, 1987, at 6. The first name of Tuma is not reflected in the record of this proceeding.

them, Murphy responded by saying "I don't recall the specific date."[25] Murphy claims that he opposed the granting of staff privileges to Tuma.

### C

The Court will now resolve the key factual disputes upon which this case turns by examining each of the three main areas that the Defendants contend played a role in their decision to terminate Ross' staff privileges at Beaumont: (1) her behavior, (2) the narcolepsy problem, and (3) the weight issue. The Court will then look in detail at Ross' factual allegations regarding discrimination.

#### 1. Defendants' Positions

##### a. Behavior

Defendants have provided this Court with a summary of the events in Ross' personnel files. They contend that these materials formed a major basis for their decision to terminate Ross:

8/29/77—member of patient's family complains of abusive verbal treatment by Ross;

1/25/78—patient complains of abusive verbal treatment by Ross;

1/31/78—mother of patient-daughter complains of abusive verbal behavior by Ross;

2/1/78—patient complains of abusive verbal behavior by Ross;

2/8/78—nurse complains that when he advised Ross of an error she had placed on the chart, Ross replied it was no concern of hers;

3/10/78—two nurses complain of abusive verbal behavior by Ross;

3/31/78—operating room attendant complains that when Ross was advised she had contaminated the sterile field, Ross replied no one had the guts to do anything about it;

3/31/78—nurse complains Ross' reluctance to practice good sterile technique in the operating room;

5/11/78—nurse complains of intimidating antics, cruelty, poor treatment of

other hospital personnel and the public by Ross;

6/7/78—Dr. Bernard Eisenstein, Chief, Ambulatory Patient Services, counsels Ross that nurses are threatening to quit working for the hospital because of rudeness and belligerence by Ross;

7/7/78—parents of patient refuse to pay bill because of alleged unprofessional behavior by Ross;

5/5/79—Ross meets with Wilson, Medical Director of the hospital;

5/21/79—patient complains of unprofessional conduct by Ross;

7/7/79—Ford Motor Company plant doctor requests Ross not see any of the patients from the Ford Motor Company;

1/16/80—file memo indicates Ross is inconsiderate with nurses in Critical Care;

5/5/81—nurse complains of abusive verbal conduct in Critical Care Unit;

5/31/81—three nurses complain of abusive verbal conduct by Ross;

6/15/81—Murphy, Chief of Surgery, meets with Ross regarding abusive verbal behavior toward the nursing staff;

6/30/81—nurse complains of abusive verbal behavior by Ross;

7/2/81—nurse complains of abusive verbal conduct by Ross;

8/24/81—Ross is placed on probation for a period of six months because of disruptive behavior in dealing with hospital personnel by Wilson and Murphy;

9/17/81—Director of Nursing complains to hospital Medical Director of abusive behavior by Ross toward nursing staff;

4/26/82—Wilson and Hutchins meet with Ross regarding her weight problem and concern that the problem can impact on patient care;

5/7/82—nurse complains of abusive verbal conduct by Ross;

5/19/82—nurse complains of abusive verbal conduct by Ross;

---

**25.** *Id.*

5/25/82—Murphy meets with Ross regarding efforts to improve her behavior and relationships with the nursing staff;

8/10/82—Murphy, Chief of surgery, advises Wilson that Ross is not performing at an acceptable level of competency at this point. He states he bases this on the fact that she 1) is extremely overweight and has difficulty in approaching the operating table, 2) is unable to operate within the depths of the wound, 3) becomes acutely short of breath while operating, and 4) is suffering from knee problems which are probably associated with her weight and requires the use of a walker;

9/14/82—Ross returns from medical leave of absence and is placed on a period of probation for six months with the following conditions; 1) remain alert during operative procedures; 2) provide a monthly letter from a physician treating her obesity, 3) maintain an acceptable behavior pattern at the hospital, and 4) meet with the Medical Director monthly to review progress;

10/12/82—Wilson and Hutchins meet with Ross regarding her probationary status;

12/13/82—Wilson and Hutchins meet with Ross regarding her probationary status;

1/7/83—Wilson meets with Ross regarding her probationary status;

2/14/83—Wilson meets with Ross regarding her probationary status;

3/4/83—Wilson meets with Ross regarding her probationary status;

4/20/83—Ross is advised by Wilson that she is removed from probationary status but that the guidelines outlined in her probationary letter are continued;

4/21/83—two laboratory assistants complain of abusive verbal behavior by Ross;

6/30/83—Wilson meets with Ross regarding non-compliance with the terms of her probation termination;

8/24/83—Wilson meets with Ross advising her that she is becoming disruptive again and references abusive verbal conduct toward a laboratory assistant;

9/24/83—She does rounds in wheelchair;

11/5/83—nurses complain of abusive verbal conduct by Ross in the Intensive Care Unit;

11/28/83—nurses complain of abusive verbal conduct by Ross in the Critical Care Unit;

12/23/83—nurse complains of abusive verbal conduct by Ross;

1/5/84—Hutchins meets with Ross regarding her relations with hospital personnel and its interference with patient care;

3/23/84—nurse complains to Wilson that Ross is becoming disruptive in the operating room mentioning a total lack of cooperation with the scrub and circulating nurses, use of foul language, telling a nurse to order her a pizza, or else she will not sign an operative permit.

3/27/84—Wilson meets with Ross regarding rudeness and abusive behavior toward hospital personnel;

8/9/84—eight operating room staff members complain that the largest disposable operating gown did not sufficiently cover Ross such to violate the optimum asceptic environment in the operating suite;

9/12/84—nurse complains of abusive verbal conduct by Ross;

9/18/84—nurse complains of abusive verbal conduct by Ross;

10/31/84—Ross is observed at least three times falling asleep while assisting Wilson with surgery;

11/12/84—nurses advise Ross was sleeping at the nursing station at 2:00 p.m. with the phone to her ear;

11/28/84—Wilson and Hutchins meet with Ross regarding abuse to personnel and sleeping at inappropriate times;

4/24/85—nurse complains of two instances of abusive verbal conduct by Ross;

5/14/85—Murphy meets with Ross regarding two complaints about behavior

and remarks made to nursing staff on April 27 and 28, 1985;

5/23/85—Ross advised that her staff privileges are terminated.

It is not necessary to decide whether the matters within the documents are true or not. Instead, this Court must determine if Beaumont's decision to terminate Ross was motivated by the materials in the file. This Court finds that the Defendants did rely heavily on the materials in the file, as well as the other complaints from the staff when they decided to terminate Ross. In addition, Wilson repeatedly emphasized that the file was only "the tip of the iceberg" regarding complaints about Ross.

Ross challenges the veracity of these reports, alleging that:

1. She was never given a chance to respond to the allegations in the reports and to the materials in her personnel report or even see these allegations.
2. Wilson went out of his way to get damaging information inserted into her personnel file; and
3. Her personnel file was so filled with inaccuracies that Wilson's reliance on it demonstrates his intention to discriminate against her.

The testimony at trial regarding Ross' first point is very telling. The following exchange occurred during the direct examination of Ross regarding her meeting with Wilson and Hutchins on August 1, 1982:

Q: Did you every request to see your personnel file?

A: Yes, I did.

Q: And did you request to see your file during this meeting?

A: Yes.

Q: Okay. And tell the jury what happened?

A: Dr. Hutchins and Dr. Wilson met with me and told me that I was going to sleep inappropriately, including in the operating room. And

I have never been, in any of my previous meetings with Dr. Wilson, been able to get any specifics out of him. He would say that I was rude to somebody, but he would never identify "somebody." There was no way I could interact to change anything, because I didn't know what specifically he was talking about, except in one or two episodes. And in order to stop this process, I asked specifically to see my file at that time, to see what had happened. And they sort of ignored what I said.

Q: Did you get the file?

A: I never got the file.[26]

This Court finds her statement, "And they sort of ignored what I said," to be significant. This hardly shows the kind of outright refusal that Ross sought to imply at trial.

Indeed, this Court finds that it is far more likely that Ross' request to see her personnel file was in a sense lost during the course of the meeting and she never renewed it. This Court believes Ross when she asserts that these meetings were difficult experiences for her because it was intimidating to meet with the Chief of Staff and Vice Chief of Staff.[27] However, this Court is not willing to give credence to Ross' attempt to imply that the Defendants refused to allow her access to the personnel files. It appears far more likely that she did not vigorously pursue this request.

Moreover, this Court does not believe that Ross can fairly characterize herself as being deprived of an opportunity to respond to the various accusations against her, especially when the trial testimony indicated that she had numerous meetings with Murphy and Wilson during her tenure at the Hospital. Although this Court is aware of the difficulty and awkwardness of meeting with one's superiors, there is no evidence that the Hospital turned a deaf ear to Ross at these conferences.[28] Indeed,

26. Transcript, Ross, February 18, 1987, at 68–69.

27. *Id.* at 73.

28. For example, Ross does not deny that she was accused of being rude to a Beaumont security officer who had found her car to have been illegally parked on the Hospital grounds. While

the Hospital repeatedly kept Ross abreast of their concerns about her.

Ross claims that Wilson "manufactured" reports against her. In support of this contention, Ross points to several examples of Wilson's alleged "manufacturing." Initially, Ross notes that when she was requested to go on a medical leave or absence in 1982, Wilson told her that obesity was one of the reasons which necessitated a medical leave. After her meeting with Wilson on July 28, 1982, Ross contends that Wilson urged Murphy to provide him with *post-hoc* documentation of her weight difficulties. She asserts that Murphy forwarded a memorandum to Wilson on August 10, 1982, in which he expressed his concerns about Ross' weight. She contends this memorandum, which was placed into her personnel file, is the kind of untrue evidence that has been "manufactured" by the Defendants.

Wilson has readily conceded that he asked Murphy to conduct an evaluation of Ross. Such a written evaluation hardly constitutes "manufacturing" of fake evidence. Wilson testified that he simply wanted documentation about Ross because she had threatened a lawsuit against Beaumont on several previous occasions.

■ Ross' second major example of Wilson's "manufacturing" efforts relates to an incident which occurred after she had been taken off of her leave of absence. Ross contends that, in September 1982, Murphy, acting upon Wilson's instructions, sent a memo to Patricia Schultz, one of the nurses in charge of the operating rooms at Beaumont, in which she was asked to report any unusual action or behavior by her in the operating room. Ross says that Murphy's request was an act of harassment which

resulted in her personnel files being filled with untrue statements.

In response, Wilson and Murphy acknowledged the monitoring of Ross, asserting that it became necessary in order to ensure patient safety and to preclude a recurrence of her sleeping at inappropriate times or acting in a disruptive way.

This Court finds such concerns to be extremely valid in a context where a patient's life is on the line. Such a reason for requiring monitoring under these circumstances does not qualify as harassment. Accordingly, this Court finds that Ross' personnel file neither contained "manufactured evidence" nor evidence about which she had no chance to respond.[29] Ideally, Ross should have been given more chances to respond. However, she was certainly given numerous chances and, indeed, showed very little interest in seeing her personnel file.[30]

The Court must now evaluate the truth, if any, of the Defendants' allegations (to wit, that Ross' behavior was extraordinarily disruptive) independent of the hearsay in the personnel file. Murphy and Wilson ranked her as the worst surgeon in the Hospital in terms of disruptiveness. They also ranked her as the worst in terms of number of complaints, kind of problems (narcolepsy), and the ability to correct her difficulties.

They were not the only people who made this observation. In questioning from the Hospital's counsel, Nurse Shawn Livermore gave the following testimony:

Q: Anything you observed either directed toward you or toward someone else.

A: Well, she used to scream at me frequently, accusing me of holding her up, holding her patients up in the operating room, implying that I had an

acknowledging the parking violation, she denied being rude to, or swearing at, the hospital officer on June 19, 1982. Her denial appears in the personnel file. Numerous other denials of various incidents and alternative explanations also appear.

**29.** The only exception is the so-called Smith letter which is discussed, *infra.* However, that letter turned out to be relatively harmless for reasons which will also be brought out, *infra.*

**30.** Ross spent much time during the trial attacking the veracity of the reports. Since the reports were not admitted for their truth, these efforts only go to the reasonableness of Wilson's reliance on the file as a whole. This issue has already been addressed in part. Moreover, the matter of whether Ross behaved abusively is discussed, *infra,* and her accounts of these incidents will be discussed at that time.

ulterior motive, which I never did. I mean, I would have no reason to hold up a case. It just prolongs the day for everybody.

Q: How often did that occur?

A: Any time she was delayed.

Q: Did you ever observe her yelling or screaming at other people in the operating room?

A: Yes.

Q: Who?

A: I can't recall, offhand.

Q: Would it be nurses or operating room technicians or other physicians?

A: Everybody. I've heard her yell at other doctors or walk away complaining, carping about other doctors, operating room technicians, nurses, anybody.

Q: Did other doctors in the hospital, to your knowledge, approach this level of conduct?

A: No.

Q: Did you report this kind of conduct to anyone?

A: Yes, I reported it to Ms. Schultz.

Q: Can you give us some kind or the frequency in which this type of conduct would occur?

MR. ROLLINS: Again, this is based on her own observations.

THE WITNESS: 80 percent of the time, 90 percent of the time.

Q: (By Mr. Page): Based on your experience, did that impact on the quality of care that the patient was receiving in the operating room?

A: Towards the end, yes. Yes.

Q: Okay. Why do you say that?

A: Prior to that or earlier like, say, in 1980, '81, '82, it wasn't as bad. Okay. The outbursts and the temper tantrums, if you will, weren't as frequent. As time went on, it seemed to get worse, progressively worse. It always seemed cyclical.

Q: Was every instance of this type of conduct that you observed written up by you or anybody else, if you know?

A: God, no.

Q: Pardon me?

A: No.[31]

The following exchange also occurred between counsel and Nurse Susan Marshall:

Q: You talked about your encounters with Dr. Ross and other observations in that regard with other nurses. You also talked to—addressed that subject with respect to Drs. Friedman, Jaffee, Ravikant and Ho?

A: Yes.

Q: How would you describe the frequency of that type of occurrence with Dr. Ross as opposed to those other doctors you mentioned?

A: Dr. Ross yelled at us very consistently. The other doctors, it would happen maybe on an occasion, but it was really consistent that it came from Dr. Ross.[32]

At the trial, Ross pointed to some supposed inconsistencies between Marshall's trial testimony and her deposition testimony. However, she did not identify any deposition material which contradicted these particular assertions by Marshall.

In addition, the Defendants cited other examples which depicted Ross yelling at nurses or patients, and saying extremely inappropriate things. Nurse Maura Turner said that Ross screamed at her for not being able to hear a pulse through a claveter. Nurse Laurie Burcal once hid from Ross to avoid working with her.

Ross dismisses the validity of the latter comments, contending that Burcal was emotionally unbalanced. Even if Ross' counterargument is assumed to be true,[33] there is no other evidence that Burcal manifested any similar behavior or was as adversely affected by anyone other than Ross. Some nurses were driven to tears by Ross. Wilson was repeatedly subjected

---

**31.** Transcript, Livermore, January 20, 1987, at 10–11.

**32.** Transcript, Marshall, January 22, 1987, at 41–42.

**33.** This Court makes no assessment regarding Burcal's emotional state.

to requests from various nurses to take some administrative action to protect them from Ross' oppressive behavior. The mother of one patient recounted the rudeness to her daughter by Ross who did not believe that she should have been brought to the Emergency Room. According to Marshall, Ross once told her regarding a patient who was having respiratory difficulty that she should "get some morphine, take it in, close the door and finish it." [34] Although Marshall did not believe that Ross really meant it, her comment was not said in a joking fashion. Marshall then testified that Ross ... told me not to bitch if I wasn't willing to do this for the—not to bitch that he wasn't able to die if I wasn't able to do this for him." [35] Marshall also claims that Ross told her, "I only want to know if my patients are dead." [36]

In response, Ross asserted that her statements were not meant to be taken seriously and merely reflect the frustration of a medical doctor whose patient is in deep trouble. Nevertheless, and significantly, Ross does not deny the statements that Marshall attributed to her.[37]

During the trial, Ross recounted her recollection of the various events that transpired during the evening of March 9, 1978 when she was working in the Emergency Room. Nurse Norman Klotz claims that Ross yelled at him and other nurses during the evening and acted unprofessionally toward the patients. While attributing this conflict with the nurses to their collective incompetence, it is noteworthy that she did not deny the expressions of anger or the extremely brusque behavior which Klotz attributed to her.

In response to statements that she was rough with a patient on May 21, 1979, Ross emphasized that Russel Busch, the nurse in charge of the case, had mishandled the catheter. Ross also acknowledges she got quite upset in July 1981 at a mistake by a nurse regarding a catheter.[38] The nurse

involved in the incident was more specific and indicated that Ross became quite verbally abusive during the incident.

Ross replies by stating that these actions were motivated by her extraordinarily high standard of care. Essentially, she says that her occasionally strong reactions to other people were due to nurse incompetence which endangered the patient's safety. Although this Court accepts Ross' representation (to wit, that she had a deep concern for patients), there is an abundance of uncontradicted evidence of her disruptive behavior at Beaumont.

### b. Narcolepsy

The following incidents from the personnel file of alleged sleeping problems are hereby summarized:

3/17/82—Director of Nursing reports to Dr. Wilson that Dr. Ross fell asleep and snored while chairing a Utilization Review Committee meeting. Director of Nursing further reports that operating room nurses feel that they cannot allow Dr. Ross to sit down while doing an operation because she would fall asleep;

7/2/82—Dr. Ross falls asleep numerous times and has to be spoken to in a loud voice to wake her and have her continue her surgical assistance during an operation;

7/28/82—physician's assistant reports to Dr. Wilson that Dr. Ross has an increasing problem with alertness during the performance of surgical procedures including incidents of head nodding, dropping of instruments and lack of concentration;

7/28/82—Dr. Ross is requested to take a medical leave of absence to correct the problem of going asleep at inappropriate times such as in committee meetings and in the operating room.

---

**34.** Transcript, Marshall, January 22, 1987, at 40.

**35.** Id.

**36.** Id. at 34.

**37.** This Court found Marshall's assertion (to wit, that Ross made such statements) to be very credible.

**38.** Transcript, Ross, February 17, 1987, at 94.

Ross, while claiming to have been unaware of her sleeping problems during this period, strongly asserts that the patients were never placed in danger by this malady. Nevertheless, this Court finds that these incidents certainly came very close to adversely affecting the lives of her patients. For example, on one occasion when Ross was having trouble concentrating, she had difficulty handling the instruments and finding the vein of a patient.

There is a factual dispute as to whether Ross had any sleeping incidents after she was diagnosed as narcoleptic and received corrective medication. She had the following exchange with her counsel:

Q: And since you have been treated with—by Dr. Mounayer for narcolepsy, have you had any indication of falling asleep in surgery?

A: No sir.[39]

Notwithstanding this denial, there were several references to post-medication sleeping episodes by her during the trial. For example, in October 1984, she was reported to have fallen asleep during an operation with Wilson. During the following month (November 1984), she was seen sleeping with a phone in her ear. Lastly, she was said to have fallen asleep at a committee meeting.

Ross has denied sleeping in the operating room. With regard to the October 1984 incident in the operating room, Ross submits that she felt ill because of the high temperature in the operating room, and received permission from Wilson to briefly sit and rest her eyes.

Ross' version appears to be somewhat flawed, in that the trial record suggests that, while nodding, her head fell close to the patient's wound which, in turn, endangered the requiste degree of needed sterility. Indeed, Livermore testified that she saw Ross sleeping and leaning against the patient.[40] Moreover, it appears that much of her sleeping problems were connected to an inability to concentrate. Thus, even if she was not sleeping, she was having difficulty in concentrating while performing surgery.

Ross does not deny those other incidents which occurred outside of the operating room, explaining that they were probably caused by problems with her medication dosage. Nonetheless, these unpleasant episodes suggest that Ross continued to have sleeping problems even after receiving her medication.

### c. Weight

In mid 1982, Ross was 5'2" and weighed nearly three hundred pounds. Murphy and Wilson testified at trial that Ross' weight caused them to be concerned about her ability to satisfactorily perform deeply intrusive operations. She has vigorously disputed these allegations, noting that Wilson especially continued to rely on her to assist with his operations.

Ross also vigorously argued that the weight issue provided a convenient mechanism for Wilson to "harass" her. Ross complained that even when she lost weight, he did not notice it. On the other hand, Murphy testified that by January 1985, Ross' weight had returned to three hundred pounds.

Murphy and Wilson also felt that Ross' weight was responsible for her walking and knee problems. They note that these conditions could have affected her ability to deliver quality care, citing an incident when Ross completed all of her rounds in a wheelchair. On that occasion, some of her patients had to come out of their rooms to be seen by her, while the remaining patients were not visited.

Ross introduced the testimony of Dr. Robert Allaben, Vice Chief of Staff and Surgery at Harper Hospital, who said that a person's weight should not have any meaningful impact upon a surgeon's ability to perform an operation. However, he admitted that he had not seen Ross perform surgery between 1977 and 1985. Signifi-

39. Transcript, Ross, February 17, 1987, at 121.

40. Transcript, Livermore, January 20, 1987, at 23. Moreover, Ross' explanation of this incident at trial differs from that which she gave in the earlier proceedings at the Hospital. Transcript, Ross, February 23, 1987, at 27–31.

cantly, he did not deny that a medical doctor—with a physical stature which is similar to that of Ross—might have a negative impact on a successful surgical procedure.

Several nurses testified that Ross had to lean on patients to operate which caused some risk to the sterile field. The following exchange between Livermore and the Defendants' counsel occurred at trial:

Q: (By Mr. Page): Ms. Livermore, did Dr. Ross's weight, based on your observations, interfere with her ability to approach the patient to perform an operation?

A: Yes....

THE WITNESS: My answer is yes.

Q: (By Mr. Page): Did Dr. Ross's weight interfere with her ability to reach the area—

A: Yes, it did.

Q: —where her hands needed to reach to perform the surgery?

A: Yes.

Q: Did Dr. Ross in the course of surgery ever lean—have her body leaning on patients who were being operated on as a result of her size where a doctor of a different size would not have that situation?

A: Frequently, yes.

Q: Did you ever observe operating room nurses or technicians trying to prevent that from happening or speaking to Dr. Ross about that?

A: Yes.

Q: What did you observe in that regard?

A: They would ask her not to lean on the patient, please.[41]

This Court finds that the Defendants have satisfactorily demonstrated that Ross' weight caused her to have to lean on patients in order to perform operations in the depth of the wound. However, there has been no evidence which would demonstrate that Ross' surgical skills were made less proficient because of her weight problem. Although Murphy did say that the quality of her work was less, this Court has only been shown evidence that it was more awkward for Ross to operate. In contrast with the narcolepsy and behavior concerns, Ross' personnel file was relatively barren of reports which relate to the overweight problem from persons other than Murphy and Wilson.

### 2. Ross' Positions

#### a. The Behavior Problems of Others

Ross introduced an abundance of evidence of the behavior difficulties of other male physicians at Beaumont in an effort to show that she was treated unfairly compared to them. This Court has carefully examined the personnel files of Drs. KKK, NNN, and CCC, as well as the trial testimony regarding other doctors.[42] As a result, this Court agrees with the conclusions of Murphy, Wilson, and several of the nurses that Ross was unique in terms of the number of disruptive incidents.

The closest comparable physician is KKK who has a very lengthy record of behavior difficulties. However, the testimony at trial showed that he responded to his reprimands far more satisfactorily than Ross. Moreover, this Court notes that KKK and Ross had incidents involving their surgical ware. KKK became extremely upset when the operating room ran out of large scrub pants. Ross often had difficulty in fitting into her surgical gowns. Yet, KKK's actions regarding his patients received exactly the same kind of administrative action that Ross received.

It is apparent that Wilson met more frequently with Ross than he did with KKK. However, at the same time, the trial record also established that Wilson complained to KKK on many occasions about his unruly behavior.

#### b. Wilson's Actions

Ross contends that numerous actions by Wilson show his sexist bias. She points to

---

**41.** Transcript, Livermore, January 20, 1987, at 21–22.

**42.** This Court used a system of referring to the medical doctors, who are not parties to the instant lawsuit, by an alphabetical code in an effort to preserve their privacy.

the following memo by Wilson in August 1985 which appears in her personnel file:

> Dr. Ross tends to attach herself *to father figures* and, if allowed, will consume that person's total time. It is also obvious that she spends money indiscriminately, both for herself and on gifts for other persons, i.e., she is buying expensive cars, homes, boats. That is, by the way, only saying that there is some kind of psychiatric problem that results in these things, plus disruptive behavior in the hospital.

(Emphasis added). Ross correctly points out that no comparable memo appeared in the personnel files of any other physician at Beaumont.

In addition, the following exchange between Ross and her counsel occurred at trial:

> Q: ... (I)n any of your meetings with Dr. Wilson, did he ever refer to himself as Father Wilson to you?
>
> A: Oh, yes, many times. I would walk into a meeting and Dr. Wilson would say this is time for your monthly meeting with Father Wilson.
>
> Q: And what was your reaction to that?
>
> A: I was—I always thought that was so demeaning and humiliating, and there was nothing I could say; he was Chief of Staff. but he wasn't my father. He wasn't my priest and he had no reason to say that.[43]

Ross gives numerous other examples of actions by Wilson which she claims show his stereotypes of women. Numerous memos to the file from Wilson and Murphy refer to her behavior and moods as cyclical.[44] One memo deserving mention is that of August 25, 1983, when Wilson said of her behavior:

> This seems to go in cycles and that after this is called to her attention, she seems to act better.... She did a little crying. She stated that she gets tired and upset, and when this happens she tries to take some days off.

In a memo of March 27, 1984, he also said that "she tends to self destruct." The timing of Ross' firing is also of interest. Instead of terminating Ross during an "off hour," Wilson summoned her into his office while her patient was being prepared for an operation. In terminating the privileges at that time, he effectively prevented her from performing the operation. As a result, the surgery had to be rescheduled.

Ross also testified that, on occasion, Wilson would mistakenly interpret an event and then incorporate his errors into a memo which was ultimately placed in her personnel file. As an example, Ross spoke of an incident on August 25, 1983 in which Wilson wrote that a needle was placed into the hand of a patient who had a venous trombosis when, in fact, the patient actually had an arterial embolism. Ross said that his mistake in the memo made no sense to her because she had told him what happened.[45] In general, Ross alleged that Wilson relied almost exclusively on second hand information.

Ross also criticized Wilson's actions regarding Smith immediately prior to her termination. In May 1985, Wilson called Smith and essentially told him that Ross was regressing. He asked Smith to write a letter in support of her termination. Wilson then wrote a memo to the file which spoke of his conversation with Smith:

> He agreed that she was not following any kind of recommendation for improving her situation. He felt that she was so lost in self-denial, that she was unable to see the situation and obtain treatment ... He stated that he would send a letter that she had not followed treatment.

Although the memo indicates that Smith believed Ross to have regressed, he had not seen her since their first meeting and had relied solely upon the assertions of Wilson in making his assessment. Thus, Wilson provided Smith with all his information and

---

43. Transcript, Ross, February 18, 1987, at 31.

44. Defendants' Exhibit 5. See memos dated August 24, 1981, August 25, 1983, March 23, 1984,

March 27, 1984, July 2, 1985, November 28, 1984.

45. Transcript, Ross, February 18, 1987, at 10.

then put a note in the file which incorrectly implied that Smith had arrived at his conclusions independently.

As a result, Smith forwarded the letter to Wilson on May 23, 1985, as requested. However, following Ross' visit to his office on the following day, Smith realized that he did not agree with Wilson's assessment. He testified about his reaction to seeing Ross:

> My observations were totally in contradiction with the information I had been given over the phone; that she continued to lose weight, that she had no difficulty with sleeping during waking hours and that even the inter-personal problems were, in her mind getting better.[46]

Smith said that his personal observations of Ross and the comments of Wilson "... were totally in opposition to each other.[47] Smith then became very fearful that Wilson would use his original letter against Ross. On May 24, 1985, he drafted and personally delivered a second letter which discounted his conclusions of the May 23rd communication, opining that Ross had fully complied with his recommended treatment program. Nonetheless, Smith concluded that the relationship between Beaumont staff and Ross had deteriorated to such an extent that a parting was inevitable. Therefore, he urged the Hospital to allow her to resign from the staff—not to involuntarily terminate her.

Wilson's actions in connection with this incident came perilously close to manufacturing of evidence. However, when Wilson appeared before the Medical Executive Board, it is noteworthy that he submitted Smith's second letter (May 24, 1985)—not first letter (May 23, 1985) for its consideration. Thus, despite Wilson's earlier actions, Smith's independent view (to wit, that Ross was progressing fine) was made available to the Board for its consideration.

Ross also complains that the Defendants' announced basis for her termination was only a smokescreen for discrimination. Ross' letter of termination stated, in part, that she could not remain on the Hospital staff because of her failure "to provide a monthly letter from the physician treating your obesity." However, Wilson acknowledged that it had actually been several months since she had provided him with such a letter. Thus, Ross asserted that she thought Wilson's motives were suspect when he, in May, suddenly found this to be a basis for her termination.

During the trial, several of the nurses, as well as Wilson and Murphy, were asked whether Ross had been singled out because of her sex. The uniform answer was no. For example, the following exchange occurred with Livermore:

Q: From your personal observations in the operating room and around the hospital, in your opinion, was Dr. Ross' sex a factor that her staff privileges was revolved?

A: Not at all.

Defendants have also denied that Ross was a victim of sex discrimination by pointing out that the great majority of the complaints against Ross came from female nurses.

### c. The Hospital Structure and Composition

Ross contends that evidence of sex discrimination can be gathered from an examination of the composition of the decision making bodies of the Hospitals. At the time of her termination, Beaumont had one hundred and twenty five male doctors and three female doctors. Ross was the only female at the Troy facility. In the history of Beaumont, only two physicians had ever been placed on probation solely because of their behavior, both of whom were women; namely, Ross and Dr. Sarah Ravikant.

The only voting members of the Medical Executive Board were men. Moreover, the members of the Board were appointed by Wilson, with the exception of three persons, all of whom voted against Ross' termination. The Beaumont Appeals Council was also composed of male doctors. On the basis of the total absence of women at the Hospital's decision making process,

---

**46.** Transcript, Smith, January 26, 1987, at 35.   **47.** *Id.* at 36.

Ross argues that she, as a woman, was unable to get fair treatment from these Beaumont male dominated decision making bodies.

As an example of the pretextual nature of the Hospital committee reviews, Ross points out that the Medical Executive Board based its decision to terminate her staff prvileges upon her violation of probation. However, Ross asserts that she was not on probation at that time.

### III

■ Initially, this Court must determine whether Title VII applies to Ross. Specifically, Title VII makes it illegal for:

an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

Beaumont contends that it is not subject to the strictures of Title VII, in that Ross was an independent contractor—not an employee—who had privileges to perform surgery at its Hospital facility.

This Court disagrees. In *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1983), the Supreme Court ruled that the right of an associate at a law firm to be considered for partnership was one of Hison's "terms, conditions, or privileges of employment" since that was an expectation created by the contractual relationship. Moreover, in *Amro v. St. Luke's Hospital*, 39 F.E.P. 1574 (E.D. Pa.1986) [Available on WESTLAW, 1986 WL 766], the district court found that the *Hishon* analysis applied to a medical resident's right to be considered for staff privileges at the hospital of residency. Although not entirely apposite, *Hishon* and *Amro* suggest that Ross has a contractual privilege or has been granted a benefit to use Beaumont's facilities for surgery. Thus, any determination of such privilege

or benefits are subject to the restrictions of Title VII. *See also, Armbruster v. Quinn*, 711 F.2d 1332, 1340 (6th Cir.1983), where the court held:

Rather, one must examine the economic realities underlying the relationship between the individual and the so-called principle in an effort to determine whether that individual is likely to be susceptible to the discriminatory practices which the act was designed to eliminate.

Under this so-called "economic realities" test, *Armbruster* concluded that a court has an obligation to look beyond the title of a claimant's position to determine the applicability, if any, of Title VII. It suggested that a court should consider a number of factors in making such a decision, including the hiring and termination process, history of the positions, evidence of company payments and benefits, advancement opportunities, etc.[48] This Court believes that issues which address an employee's ability to obtain comparable employment and the nature of the disciplinary mechanism are additional factors which should be explored in an attempt to resolve this issue.

Ross clearly satisfies Title VII under this standard. She based her whole livelihood at Beaumont, including service as chairperson of some of Beaumont's committees, underwent extensive progressive discipline, including probation and leaves of absence. The strictures of Title VII clearly apply to the Defendants.

■ The burden of proof in a Title VII case was memoralized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons of-

**48.** *Id.* at 1342.

fered by the Defendant were not its true reasons, but a pretext for discrimination."

*McDonnell Douglas* also sets forth the requirements of a prima facie case in a race discrimination hiring case. As modified for this case, Ross must establish that:

1. She is a member of a Title VII protected class;
2. She performed her job satisfactorily until terminated; and
3. After her termination, the employer solicited applications for the position.

*See Potter v. Goodwill Industries of Cleveland,* 518 F.2d 864 (6th Cir.1975) (discharge case).

The Supreme Court and the Court of Appeals for the Sixth Circuit have made clear that these factors are not to be applied inflexibly. Thus, in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), the Supreme Court, in noting that "the burden of establishing a prima facie case of disparate treatment is not onerous," determined that a prima facie case simply "... raises an interference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254, 101 S.Ct. at 1094, *citing Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

The Sixth Circuit Court of Appeals does not require proof of the three traditional prima facie elements in every case. *See Beaven v. Commonwealth of Kentucky,* 783 F.2d 672 (6th Cir.1986). The *Beaven* Court explicitly rejected any "mechanistic" application of the *McDonnell Douglas* prima facie elements and held that the plaintiff had met his burden despite being unable to prove that the employer continued to solicit applications after his dismissal.[49] The court relied on other factors that were sufficient to "give rise to an inference of discrimination."

This Court is satisfied that Ross has met her prima facie burden of establishing sex discrimination by the Defendants. She is certainly a member of a protected class. Moreover, this Court has found that Ross satisfactorily performed the technical aspects of her surgery. The Defendants do not dispute this point.

Ross does have some difficulty in meeting the traditional third criteria because the trial record is a bit ambiguous in this area. Ross did general and peripheral-vascular surgery. Shortly after her termination, Rimar began practicing as a general surgeon at Beaumont, although his application had been accepted prior to the date of her termination. Moreover, the record is not clear as to whether Tuma had been granted privileges as a peripheral-vascular surgeon prior to Ross' termination from the Hospital. Thus, it is arguable that as a result of the collective efforts of Rimar and Tuma, they assumed Ross' work responsibilities at Beaumont. This would be akin to the Hospital soliciting applications after her discharge.

■ However, even if the typical prima facie criteria had not been satisfied, Ross has satisfied *Beavens* by enumerating several factors which created an inference of discrimination. These include:

1. Wilson's statements that she viewed him like a father type figure and his assertions about how she spent money, etc.;
2. Wilson's actions in procuring a letter from Smith to support her termination;
3. Wilson's assertions in his termination letter that the decision was based on her failure to provide a monthly letter regarding her weight reduction efforts when he had not required one for months;
4. The Medical Executive Board's statement that she was terminated for violation probation when she was not on probation;
5. Wilson's occasional inaccuracy in Ross' personnel file as well as the questionable timing of his termination of Ross;

---

**49.** *Id.* at 676.

6. The virtually all male decision making structure at Beaumont, most of whom were appointed by Wilson, as well as the great subjectivity in the standards for termination; and

7. The only two doctors to be placed on probation for behavior reasons were women.

Taking all these factors together, this Court believes that Ross has created an inference that she was terminated because of her sex.

■ To rebut the prima facie case, the Defendants must articulate some legitimate non-discriminatory reason for the discharge. *Furnco,* 438 U.S. at 578, 98 S.Ct. at 2950. In the instant case, they have emphasized that Ross' disruptive behavior constituted a legitimate non-discriminatory basis for her discharge.[50] Defendants stated that her behavior impaired the efficient functioning of the Hospital, especially the operating room where she performed surgery. They have provided extensive documentation and testimony supporting such a claim. Thus, Defendants have satisfied their initial burden as well.

■ Since the Defendants have successfully presented a legitimate non-discriminatory reason for their action, Ross must now carry the burden of showing that this stated reason is a pretext for discrimination. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. At this juncture, "the *McDonnell–Burdine* presumption 'drops from the case,' ... and 'the factual inquiry proceeds to a new level of specificity.' " *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed. 2d 403 (1982), *citing, Burdine,* 450 U.S. at 255, 101 S.Ct. at 1095. Ross can satisfy her ultimate burden" [d]irectly by persuad-

ing the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[51]

In *Goostree v. State of Tennessee,* 796 F.2d 854 (6th Cir.1986), the Sixth Circuit Court of Appeals set forth a burden of proof at the pretext stage; namely, that a Title VII plaintiff must show that sex was a 'but for' cause of her termination. Thus, the court held that:

> The mere showing that "sex was a factor" rather than than a "but for" factor is insufficient to establish liability under Title VII.[52]

The court further stated that:

> This "but for" causation is satisfied when the plaintiff establishes that the defendant's discriminatory intent more likely than not was the basis of the adverse employment action.[53]

"Generally, there are three types of evidence which can be used to show pretext: statistics, direct evidence of discrimination, and comparative evidence." Schlei, Grossman, *Employment Discrimination Law* 2d Ed., 1983 at 597. Therefore, this Court will look at each factor, keeping in mind that Ross must show that her sex was the "but for" cause of her termination.

■ During the trial, Ross sought to show how she was treated differently than similarly situated males. If proven, this would be strong evidence of disparate treatment and pretext. *See e.g. Davin v. Delta Airlines, Inc.,* 678 F.2d 567, 570 (5th Cir.1982). However, this Court concludes that Ross has not pointed to anyone who was similarly situated. *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 709 (6th Cir. 1985).[54] The testimony from nurses at

---

50. The Court need not address whether Ross' sleeping and weight problems would constitute legitimate non-discriminatory reasons for discharge. Her allegedly disruptive behavior—standing alone—is sufficient.

51. *Id.* 450 U.S. at 256, 101 S.Ct. at 1095.

52. *Id.* at 863.

53. *Id.*

54. This Court is aware that the *McDonnell–Douglas'* criteria is meant to be applied to discrimination cases based on circumstantial evidence—not direct evidence of discrimination. *See e.g. Transworld Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1984). If a plaintiff has shown such direct evidence, the Sixth Circuit Court of Appeals then shifts the burden of proof to the Defendant to show that it would have made the same decision even though discrimination was a

Beaumont consistently ranked Ross highest in terms of abusive and disruptive behavior. Her effort to discredit the nurses was unsuccessful, given the consistency of their testimony. Moreover, this Court concludes that her level of disruptiveness exceeded that of any other professional staff person at Beaumont, including Dr. KKK. In addition, no other doctor had a malady which threatened patients at the Hospital. Simply put, there was no one who was similarly situated to Ross at Beaumont.

Ross next argues that all of the differing explanations by the Defendants were pretextual. Each one will be examined in turn. She asserts that (1) her behavior was not distinguishable from that of her many male surgeon colleagues, and (2) the standards, which the Defendants utilized to govern their decision to terminate her, were totally subjective and applied by male-dominated committees and boards. According to Ross, this clearly supports her claim that the reasons, which were given by the Defendants for her discharge, were merely a pretext for sex discrimination.

The Court of Appeals for the Sixth Circuit has held:

> [t]he legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority.

*Grano v. Department of Development of City of Columbus,* 699 F.2d 836, 837 (6th Cir.1983). *Grano* also determined that subjective evaluations were not "per se" pretextual.

■ Courts have traditionally shown greater deference to subjective job appraisals in the context of "white collar" or professional positions. This approach has been taken because such positions tend to be more difficult to evaluate in a more objective quantitative fashion than "blue collar" jobs. *See e.g. Bauer v. Bailar,* 647 F.2d 1037, 1046 (10th Cir.1981) (supervisory positions "require abilities not fully measured by objective standards"); *Nath v. General Elec. Co.,* 438 F.Supp. 213, 220 (E.D.Pa.1977).

In *Van de Vate v. Boling,* 379 F.Supp. 925, 928 (E.D.Tenn.1974), the court found that a music teacher had not stated a prima facie case although she was admittedly not hired because of "subjective" reasons. The court said:

> It is not a court's prerogative to interject itself into the educational institution and to require such institution to either hire or not hire a professor. While such an institution cannot be permitted to refuse employment on unlawful and impermissible grounds, its exercise of discretion in refusing to hire an applicant because it is felt that such person could not harmoniously perform his or her duties should not be disturbed by a court in an action of this character.

Here, the Court finds the documentation and testimony about Ross' disruptive behavior to be overwhelming and credible despite her protestations to the contrary. As in *Van de Vate,* the Court does not believe that it can intrude into a business decision of this kind despite its somewhat subjective basis.

■ Ross claims that the Defendants' supposed obsession with her weight was an example of its preoccupation with a sexist stereotype—namely, that women should not be overweight. Moreover, she says

---

factor. *Blalock,* 775 F.2d at 712. This is in contrast to the *McDonnell Douglas* criteria where a plaintiff retains the ultimate burden. However, in this case, Ross acknowledged the applicability of *McDonnell–Douglas* in her trial brief. Ross has not proferred direct evidence of discrimination. There is nothing in the record as in *Lee v. Russell County Bd. of Ed.,* 684 F.2d 769 (11th Cir.1983) (member of school board spoke of getting a greater "white presence"). *Bell v. Birmingham Linen Service,* 715 F.2d 1552 (11th Cir.1983) (defendant decision maker's statement that if Bell was allowed into the washroom, all women would want to enter). *Lee* also held that the direct evidence must be "strong" in order to avoid *McDonnell–Douglas,* 684 F.2d at 774. Here, the closest that Ross came to offering direct evidence was Wilson's comments that she saw him as a father figure. This is not "direct" evidence of discrimination. Wilson could have said the same thing about a young male doctor. At most, it is circumstantial evidence of "stereotyping."

that the Defendants never proved that her weight had any adverse effect on her surgery.

There is no evidence to support Ross' contention of sex discrimination on this point. This Court is aware that discrimination often works in subtle ways via the use of stereotyped assumptions. *See e.g. Hopkins v. Price Waterhouse*, 825 F.2d 458 (D.C.Cir.1987); *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir.1983). However, this is not the situation here.

It should be noted that Ross has not produced evidence of a male whose physical size was reasonably comparable to her height and weight. Proof that some men were overweight does not make them comparable to her. In addition, there was testimony from non-parties that Ross had to lean on patients—a situation which endangered the sterility of the operation.

■ Finally, even if Murphy and Wilson were mistaken in finding that Ross' weight posed a danger to her surgery, such a misjudgment does not expose them to Title VII liability. *Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 751 (6th Cir.1985). As long as the mistake was not premised on her sex, they are not liable. This Court believes that Wilson and Murphy had very real concerns about the nexus between patient care and Ross' weight problems. Thus, their concern about weight has not been shown to be pretextual.

Indeed, a number of Wilson's seemingly inexplicable actions are best explained as demonstrating a huge frustration with Ross—not sex discrimination. His actions regarding Smith fit into this category. It is significant that Wilson and Murphy repeatedly gave Ross many opportunities to correct her deficiencies. Nurses often requested Wilson to act more forcefully against Ross.

■ Most of the nurses, who complained about Ross' behavioral problems, were women. Evidence that many of the complaints originate from persons within the same minority groups is a probative factor in support of the absence of discrimination. *See e.g. Harris v. Group Health Assn., Inc.*, 662 F.2d 869, 872 (D.C.Cir. 1981).

■ The closest that Ross came to showing sex discrimination were Wilson's condescending comments regarding his image as a father figure, and about her alleged penchant for purchasing expensive things. To the extent that these comments or Wilson's insertion of an allegedly incorrect memorandum into Ross' personnel file reflect a sexist attitude, these factors—when viewed independently or collectively—do not come close to showing that sex was a "but for" cause of her termination.

■ Ross' assertion (to wit, that the Defendants stuffed her files) also lacks merit, as in *Weems v. Ball Metal & Chemical Div. Inc.*, 753 F.2d 527, 530 (6th Cir. 1985). Defendants, in part, occasionally sought to document an incident since they had been threatened with a lawsuit. This seems reasonable under the circumstances.

■ Ross' trial pretext allegations are based on the pervasive male domination of the decision making processes. However, statistics are only of very limited value in an individual disparate treatment case. As one court has held:

> Regardless of how devastating and reliable the statistics may look, the issue remains in these cases whether a particular isolated historical event was discriminatory. An individual's discharge may be justified despite overall statistics suggesting discriminatory policies.

*Ward v. Westland Plastics*, 651 F.2d 1266, 1270 (9th Cir.1980). *See generally*, Schlei & Grossman at 598.

There is unquestionably a pervasive male domination of the power structures at Beaumont. However, in this case, the evidence does not show that this structure was the cause of her downfall. Many of the complaints came from women. She had a full Appeals Committee Hearing, and was given numerous chances to improve.

Based on all of the above reasons, this Court concludes that Ross has not shown that she was discharged because of her sex. Moreover, there is no evidence that any of the Defendants discriminated

against her on the basis of sex. Ross was discharged because of her repeated disruptive behavior and recurrent sleeping problems, as well as a perceived weight problem. She has not presented this Court with a claim against any of the Defendants which is cognizable under Title VII, 42 U.S.C. § 2000e. As a consequence, all of the Defendants must prevail on this claim.[55]

IT IS SO ORDERED.

**55.** This Court incorporates (1) all findings of fact which may be found within its conclusions of law (Paragraph II), and (2) all conclusions of law which may be found within its findings of fact (Paragraph III).