NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0298n.06

No. 22-3475

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SHARI S. DRERUP,

      Plaintiff - Appellant,

v.

NETJETS AVIATION INC.,

      Defendant - Appellee.

FILED
Jun 27, 2023
DEBORAH S. HUNT, Clerk

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

**BEFORE:** **CLAY, McKEAGUE, and STRANCH, Circuit Judges.**

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined. McKEAGUE, J. (pp. 26–29), delivered a separate dissenting opinion.

**CLAY, Circuit Judge**. Plaintiff Shari S. Drerup brought this action alleging that Defendant NetJets Aviation Inc. ("NetJets") terminated her employment based on sex discrimination in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII") and Ohio Rev. Code §§ 4112.02(A) and 4112.99. The district court granted NetJets' motion for summary judgment, and Drerup appeals from that judgment. For the reasons set forth below, we **REVERSE** the district court's judgment and **REMAND** for trial.

## I. BACKGROUND

### A. Factual Background

Shari S. Drerup was hired by NetJets in November 2016 to fly a specific aircraft, the Phenom 300 ("Phenom"). After evaluation and training, NetJets terminated Drerup's

employment, claiming that Drerup was not qualified to fly the plane they had hired her to fly. Drerup contends that discrimination—not qualification—was the cause of her termination.

In November of 2016, Drerup was hired as a pilot by NetJets, a private aviation company. Drerup had been a pilot for eleven years, primarily as a contract pilot for individuals and companies. At the time she applied to NetJets, she worked for a private company flying a Citation V jet, "three or four times a month." (Drerup Dep., R. 45-3, Page ID # 216–217). Drerup is certified to fly (*i.e.*, type-rated[1] in) five aircrafts, including two that were in NetJets' fleet—the Citation Encore+ and the HS-125 Hawker 800/900. To secure her position with NetJets, Drerup was required to fly in a Citation EXLS airplane simulator, and she completed the simulation without issue. NetJets subsequently informed Drerup that she "passed [ ] all phases of the interview process" and offered her employment to fly the Phenom. (Drerup Dep., R. 45-3, Page ID # 217–18). Like all pilots hired by NetJets, Drerup was subject to a one-year probationary period during which unsatisfactory performance could result in termination.

### 1. Indoctrination Training

At the start of their NetJets employment, pilots attend two weeks of classroom-based training referred to as indoctrination ("Indoc") training. Drerup's Indoc training began on December 5, 2016, and her class included twelve other pilots, ten men and two women, who were all hired to fly the Phenom. During Indoc training, pilots are trained to follow NetJets company policies, safety protocols, and operating principles. The training is generalized and not aircraft specific.

---

[1] A type rating is a designation on a pilot's license that serves as proof that the pilot holding the license can fly that particular model and type of aircraft. "A type rating is required for any aircraft over 12,500 lbs MGTOW and/or with a turbojet powerplant." Pilot Certificates, Ratings, and Endorsements, Fed. Aviation Admin. (May 11, 2023, 5:00 p.m.), https://www.faasafety.gov/gslac/alc/libview_normal.aspx?id=6577.

While Drerup was in  Indoc training, two NetJets employees expressed concerns regarding her demeanor to Sean Kennedy, NetJets' Director of Training.  Specifically, Christopher Eastman, then Assistant Director of Training and Standards for NetJets, reported that his impression of Drerup was that she was "gruff and unrefined" and that his interactions with her left him with a "very strong impression" that her demeanor "was not aligned" with his expectations of the level of service NetJets requires for its pilots.  (Eastman Dep., R. 45-6, Page ID # 378, 403).  And Janessa Krause, the Project Manager of Training and Standards for NetJets, described Drerup as "dismissive and aloof" and "that Drerup' demeanor was not one she would expect from a NetJets pilot."  (Krause Dep., R. 45-7, Page ID # 448, 453).  Both Krause and Eastman testified that their impressions of Drerup at the time of her Indoc training did not rise to the level of an issue that needed to be formally reported.  Moreover, Drerup purports that she was never made aware of these concerns, and she offers evidence that they were not documented until February 28, 2017, nearly 2 months after Drerup completed Indoc training and one day before she received her termination letter on March 1, 2017.  Regardless, Drerup proceeded to the next phase of the course, passed the necessary tests, and graduated from Indoc training

### 2.  Fit Test

In preparation for Indoc training, new hires are required to fill out a "fit test form."  (Drerup Dep, R. 45-3, Page ID # 218).  The form requested "[m]easurements of your body in a seated position, hip to the knee, knee to the toe" and the pilot's general height.  (*Id.*).  The Phenom uniquely "has a panel that gets in the way of some with longer femurs," which makes it "unlike other aircraft[s]."  (Eastman Dep., ECF No. 45-6, Page ID # 387).  The fit test form is intended to provide NetJets with the information to determine if pilots can "fit" in the aircraft.  (Eastman Dep., ECF No. 45-6, Page ID # 387; Kennedy Dep., ECF No. 45-10, Page ID # 583).  NetJets uses the

fit test measurements to determine whether a pilot is too *tall* for the Phenom and should therefore be reassigned, not whether the pilot is too short. Although some taller pilots could fly the Phenom safely by "[finding] a way to make it work," there were enough complaints about the safety and comfort of flying Phenom from taller pilots that NetJets developed the "fit test." (Eastman Dep., ECF No. 45-6, Page ID # 387).

After successfully completing her Indoc training, Drerup was assigned to the Phenom fleet. However, not all of Drerup's classmates were assigned to the Phenom. NetJets reassigned three male pilots, Eric Anderson, John Carrier, and Timothy Allan Buss, to the Citation Encore + "based on [the pilots'] measurements" and their inability "to safely fit within and operate the Phenom." [2] (NetJets Resp. to Interrogs., R. 52-1, Page ID # 727). Therefore, these three male pilots were never required to fly or engage in simulator training for the Phenom. Beyond the fit test, no other reasoning was provided for the their reassignment, and neither party has described how a reassignment is processed and decided.

### 3. Flight Simulator Training

After completing Indoc training, ground training, and passing the necessary Federal Aviation Administration ("FAA") oral examinations, NetJets pilots are provided flight simulator training by FlightSafety International Inc. ("FSI"), a vendor NetJets uses to facilitate flight training. At FSI, FAA-certified flight instructors take the pilots through a series of training exercises for their aircraft. Pilots typically engage in seven simulator sessions, and each session covers a specific set of skills or maneuvers that the pilot must be able to perform in order to be recommended for the FAA-mandated practical test, called a "check ride," that pilots take after

---

[2] Drerup avers that "[a] fourth pilot requested to be placed in another plane and his request was granted," but she does not elaborate nor explain the relevance of this pilot to her claims. (Drerup Am. Decl., R. 55-1, Page ID # 807).

completing the simulator training.  FSI instructors use a four-point grading scale to evaluate pilots on each required skill or maneuver during simulation.  A "1" indicates proficient; a "2" indicates normal progress; a "3" indicates needs additional training; and a "4" indicates unsatisfactory.  A pilot must be graded proficient in all maneuvers to be recommended for a check ride.  A rating of "3" means that a pilot is progressing slower than normal and needs additional training before being recommended to a check ride.  Such a rating is unusual and requires a report to the union.  Drerup received twelve ratings of "3" during her simulation training.

Drerup was assigned to Charles Felton as her simulation partner.  Felton was an employee of NetJets and had been type-rated in NetJets' planes.  Drerup and Felton began their simulator training on February 15, 2017.  At the beginning of simulation training, Drerup's course was delayed, because Felton and the flight instructor did not get along.  Felton asked Leon Lambert, Phenom Program Manager for FSI, for a different FSI instructor.  Lambert then reassigned Felton and Drerup to Ashley Messenger, another FSI instructor.

As Drerup continued her simulation training on the Phenom and was tasked with controlling the plane during an engine failure (performing an "engine out maneuver"), "it became apparent that [she] was struggling to maintain aircraft control with one engine operating on full power and the other engine failing."  (Drerup Am. Decl., R. 55-1, Page ID # 807).  Drerup claims that she previously never struggled with performance in any of five aircrafts she is type-rated to fly.  With respect to the Phenom, however, Messenger testified that Drerup had difficulty pushing the aircraft rudder pedal to the floor when one of the engines stopped working—a serious safety issue because if the rudder is not to the floor, the plane can roll to the side of the nonworking engine and crash.  At one point, Messenger told Drerup that her legs were too short to fully reach the floor with the rudder pedals to control the airplane during single engine operations.

Although Messenger does not deny making that remark, he maintains that this was just an "off handed comment." (Messenger Dep., R. 45-4, Page ID # 323).

Messenger gave Drerup an unsatisfactory evaluation in connection with her seventh and final simulation session, on February 22, 2017, concluding that "Shari's *stature precludes* attaining sufficient control authority." (Messenger Dep. R. 45-4, Page ID # 319 (emphasis added)). Messenger avers that he meant that Drerup "needed to ensure that she utilized the aircraft's full range of seat adjustment." (*Id.*). In that final session, Drerup failed to perform proficiently on three maneuvers and was therefore not recommended for a check ride. Drerup asserts that her performance issues stemmed from her problems with the engine out maneuver and maintaining control of the plane, which "affect[ed] every procedure, every maneuver, every approach that [she did]," and that she was simply too short to complete the engine out maneuver. (Drerup Dep, R. 45-3, Page ID # 226). Drerup is 62 inches tall.

### 4. Resulting Protocol for Drerup's Unsuccessful Simulator Training

After the seventh simulation, Drerup states that Messenger contacted Lambert to advise him that Drerup was too short for the Phenom. (Drerup Am. Decl., R. 55-1, Page ID # 808; Lambert Dep., R. 45-9, Page ID # 539–41). Lambert advised Messenger that he would sit in a simulation to observe Drerup's difficulty in reaching the rudder pedals. (Drerup Dep., R. 45-3, Page ID # 228). While observing a simulation alongside Messenger and Felton, Lambert asked Drerup to push her foot all the way to the floor of the cockpit to see if she was able to fully depress the rudder pedal to the floor. Drerup testified that she demonstrated her inability to do so, even with seat adjustments. Both Messenger and Lambert maintain that seat positioning, not stature, was the issue. However, Felton testified that, during the simulation training, he heard Lambert conclude that Drerup's stature prohibited her from depressing the rudder pedal fully. (Felton Dep.,

R. 49-1, Page ID # 648). Lambert then informed the NetJets training department of Drerup's difficulty in completing the maneuver, and NetJets authorized more training.

Prior to beginning the additional training simulations, Drerup spoke to Jim Queen, NetJets' Senior Director of Training, about her inability to fly the Phenom due to her height. Queen told Drerup to do whatever she needed to do to pass simulations and the check ride, including getting a pillow to place on her seat or using platform shoes. Drerup made Messenger, Lambert, and Queen aware of her safety concerns; she explained that her height prevented her from flying the Phenom safely. Before any additional training, Drerup contacted Queen and requested to switch planes, and informed Queen that she was type-rated in two other NetJets aircrafts. Queen then contacted Eastman to inquire about changing Drerup's plane, but he did not explain the reason for Drerup's request. Instead, Queen simply stated that Drerup requested a change in planes because she "felt that she could not meet the rudder requirements in the Phenom." (Queen Dep., R. 45-8, Page ID # 485). Eastman denied Drerup's request, and Queen informed Drerup that she needed to "[m]ake this aircraft work." (*Id.*). Queen testified that Drerup is "not the only pilot that [NetJets has] that is of shorter stature," and that "there are some techniques [to help fly the plane] that can be done." (*Id.*, Page ID # 484).[3]

### 5. Additional Simulator Training

On February 23 and 26, 2017, Drerup completed additional simulator training focusing on engine-out maneuvers. Drerup bought thick-soled shoes and pillows to use during these training

---

[3] In its reply brief in support of its motion for summary judgment, NetJets included evidence that it has two female pilots who are 62–63 inches tall who fly the Phenom. However, beyond those pilots' height, the record is silent as to whether they faced similar issues as Drerup, or whether their leg measurements are similar to Drerup's.

sessions. Lambert and Messenger also gave her seat positioning suggestions to accommodate her short stature.

To ensure her success in the simulation exercise, for the February 23, 2017 simulation, Messenger warned Drerup when the engine out procedure was going to take place. Because Drerup was aware of when the engine out was going to take place, she was able to slide down in the seat, obtain rudder authority, and avoid losing control of the plane. However, even with advance warning, she did not perform the engine out maneuver successfully every time. After the February 26, 2017 simulation, FSI certified to NetJets on Drerup's training record that she was proficient in all maneuvers, including the one that Drerup claims she could not perform due to her height, and recommended her for a check ride. Messenger explained that how Drerup reached proficiency was not his concern and concluded that "after [] seat positioning mitigation, she was able to perform [the engine out] maneuver to standard . . . repeatabl[y]." (Messenger Dep., R. 45-4, Page ID # 322). He also admitted that "she was sliding" but claimed "it did not appear it made her uncomfortable." (*Id.*). However, Drerup testified that she should not have been rated proficient because when she was not forewarned of the maneuver, she only "squeak[ed] out a maneuver once out of 20 to get a 1" in her final simulation to be approved for her check ride. (Drerup Dep., R. 45-3, Page ID # 232).

### 6. Check Ride

After pilots complete simulation training, the FAA mandates that they successfully complete a check ride before they can begin "initial operating experience" on the aircraft they are certified to operate. (Queen Dep., R. 45-8, Page ID # 480). During the check ride, a FAA-certified evaluator or check airman evaluates the pilot trainee in a simulator session on FAA-prescribed aspects of flying the aircraft. On February 28, 2017, Drerup took the check ride and failed to

perform an engine out maneuver within the acceptable standard of performance—the same maneuver that she claims her height prevents her from accomplishing. Unlike Drerup's additional simulation training, the maneuver was not announced in advance during the check ride, and she did not obtain full rudder authority. The FAA stopped the check ride and failed Drerup.

When a pilot performs a maneuver below standard during a check ride, the pilot has the choice to stop the check ride completely or to continue and complete the remaining maneuvers. If the pilot chooses to continue, the pilot will only be required to redo any failed maneuvers in a subsequent check ride, not all of the tested maneuvers. Drerup chose not to continue her check ride after she failed the engine out maneuver, explaining that she felt she could not succeed due to her height. Drerup also declined additional training, feeling that it would have been futile because she was "too short to safely fly this airplane . . . and there's no amount of training that [she could get] that makes [her] leg longer." (Drerup Dep., R 45-3, Page ID # 240).

### 7. Drerup's Termination

Sean Kennedy, then Director of Training at NetJets, was responsible for making a recommendation regarding Drerup's probationary period and continued employment. Kennedy recommended that NetJets terminate Drerup. In making that recommendation, Kennedy considered that: (1) Drerup had failed her check ride and chosen not to continue; (2) she had declined additional training to help her satisfactorily complete her check ride; (3) there were concerns regarding Drerup's demeanor during Indoc training; and (4) Drerup's flight training record showed she had been graded as proficient on the engine out maneuver just days before her check ride.

Drerup's termination letter, dated March 1, 2017, stated that she was terminated "for failure to successfully complete [her] probationary period." (Termination Letter, R. 52-11, Page ID #

781). Drerup asserts that instead of terminating her employment, NetJets could have reassigned her to another aircraft as it had done for three male employees, especially since NetJets had scheduled trainings for two other aircrafts that she was qualified to fly. Kennedy explained that, from 2016 to 2017, the Phenom was the primary aircraft for which NetJets hired. Reassignments were done on an as-needed basis, and those too tall for the Phenom were placed in a plane with a larger cockpit according to the availability of those planes. The record does not provide further information as to the reassignment process and whether there is a limit to the number of reassignments for tall pilots, *i.e.*, whether some tall pilots were terminated due to no plane availability for a reassignment. Prior to NetJets, Drerup had not been terminated by any employer. At the time of her deposition in this matter, Drerup was a part-time professor of aviation at the Louisiana State University at Alexandria.

### B. Procedural History

Drerup filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which subsequently issued a dismissal and notice of rights letter. Drerup then sued NetJets and Queen, the company's Senior Director of Training, claiming that NetJets' refusal to accommodate her request to switch planes and subsequent termination of her employment was based on sex discrimination. Drerup alleged: (1) sex discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1), including a mixed-motive discrimination claim under 42 U.S.C. § 2000e–2(m); (2) sex discrimination under Ohio Rev. Code §§ 4112.02(A) and 4112.99; and (3) aiding and abetting sex discrimination, in violation of Ohio Rev. Code § 4112.02(J). Drerup subsequently filed a substantially similar amended complaint. Two months later, Drerup voluntarily dismissed all claims against Queen, and because he was the only party implicated in

the violation of Ohio Rev. Code § 4112.02(J), the third cause of action did not proceed beyond the motion to dismiss stage.[4]

NetJets and Queen moved to dismiss Drerup's complaint and amended complaint for failure to state a claim upon which relief can be granted. NetJets argued that Drerup's claims of sex discrimination failed because she had not identified supportable comparators. Specifically, she:

> does not compare herself to men with similar physical characteristics. She does not allege males of her height were reassigned while she was not, and she does not allege that males whose circumstances were equal or similar to hers were retained while she was not.

(Mot. to Dismiss, R. 8, Page ID # 40–41). The district court denied NetJets' motion, finding that: (1) arguments as to the original complaint were moot; and (2) Drerup's amended complaint plausibly stated a claim for relief for discrimination and adequately "provid[ed] NetJets with fair notice of the grounds of her sex discrimination claims." (*See* Mot. to Dismiss Order, R. 16, Page ID # 84).

NetJets moved for summary judgment in late 2021, arguing that: (1) Drerup had failed to furnish evidence that she was treated differently than a similarly situated employee who was not a member of her protected class, and that the three male pilots were not valid comparators; and (2) Drerup had failed to show that NetJets' stated reasons for termination were pretext for discrimination. NetJets did not mention Drerup's mixed-motive claim. In its reply brief, NetJets also attached an affidavit stating that "one female pilot in the Phenom fleet is 62 inches tall, the same height as Ms. Drerup. Another female pilot in the Phenom fleet is 63 inches." (Reply, Eastman Aff., R. 54-1). Because NetJets did not provide this information regarding the other

---

[4] That cause of action is also not on appeal.

female pilots until its reply, Drerup was unable to probe into issues such as the body proportions of the female pilots, their performance in flying the Phenom, or whether they were subjected to the same pressures as she was during training. However, Drerup did not move to reopen discovery, strike Eastman's affidavit, or file a sur-reply.

The district court granted the motion, issuing judgment in NetJets' favor. Applying the *McDonnell Douglas* burden-shifting framework, the district court determined that Drerup failed to establish a prima facie case of sex discrimination. The court reasoned that Drerup failed to identify similarly situated comparators, and that the three tall men were not similarly situated. Moreover, the fact that other shorter female pilots could fly the Phenom discredited Drerup's claim. The court also found that Drerup failed to cast "substantial doubt" on NetJets' cumulative reasons for termination and failed to show NetJets' reasons for termination were pretextual. (Summ. J. Order, R. 58, Page ID # 830). And as to Drerup's mixed-motive claim, despite the fact that NetJets did not explicitly move for summary judgment on that claim, the court determined that because Drerup did not address it in her response to NetJets' summary judgment motion, she had abandoned that claim. Accordingly, the court granted NetJets summary judgment on both Drerup's single and mixed-motive claims. Drerup timely appealed. In her appeal, she challenges the district court's orders granting NetJets' motion for summary judgment and terminating her mixed-motive claim.

## II. DISCUSSION

### A. Standard of Review

The Court reviews a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). A district court should grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine dispute of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The Court's "function is not [] to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *White*, 533 F.3d at 390 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In making that determination, we "must draw all inferences in the light most favorable to the non-moving party." *Id.* (citing *Matsushita*, 475 U.S. at 587). "However, 'the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the' non-moving party." *Id.* (alteration in original) (quoting *Anderson*, 477 U.S. at 252).

## B. Analysis

### 1. Single Motive Sex Discrimination Claim

Drerup asserts that NetJets discriminated against her on the basis of sex in violation of Title VII and Ohio Rev. Code § 4112.02(A) and 4112.99. This Court has recognized that "the elements and legal standards for establishing unlawful sex discrimination are the same under" the federal and Ohio state statutes. *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000); *see also Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Accordingly, we evaluate Drerup's state and federal claims under Title VII's framework.

Title VII provides that an employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A discrimination claim under Title VII can be proven with either direct or circumstantial evidence.

*Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Direct evidence is evidence that does not require any inferences to be drawn regarding the employer's motivations. *Id.* It is undisputed that Drerup has not brought forth direct evidence of discrimination. (*See* Appellant Br., ECF No. 17, 23). Accordingly, Drerup's claims are subject to the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequently clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of disparate treatment. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff proves the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the defendant carries that burden, the plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253; *see McDonnell Douglas*, 411 U.S. at 804.

### i. Drerup's Prima Facie Case

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253. "To establish a prima facie case of sex discrimination, a plaintiff must demonstrate that: '(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Peltier v. United States,* 388 F.3d 984, 987 (6th Cir. 2004)).

In this case, NetJets does not dispute that Drerup satisfies the first three elements of the prima facie case. Therefore, the only question is whether Drerup has established that similarly

situated, non-protected employees were treated more favorably. NetJets argues that Drerup cannot satisfy the fourth element because: (1) Drerup's alleged comparators are not similarly situated, and (2) Drerup did not identify a similarly situated male who was treated more favorably.

### a. Similarly Situated Pilots

Drerup maintains that the three male pilots who were reassigned to other planes are similarly situated comparators because, just like her, they were hired to fly the Phenom but could not comfortably and safely fly the plane due to their stature. Those pilots, Drerup contends, were accommodated in a way that Drerup was not: they were assigned to different planes. The district court rejected that argument because the male pilots had not passed the "fit test," or "struggled during simulator training, failed check rides, declined to continue, and refused additional training." (*See* Summ. J. Order, R. 58, Page ID # 826). However, the district court's formulation of the similarly situated standard is overly narrow and unmoored from this Court's precedent.

Drerup is not required to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated,'" but must furnish evidence that shows she was similar in "all of the *relevant* aspects" to the three male pilots in her class. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Courts "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* Interpreting the similarly-situated standard to require an exact correlation would prevent a plaintiff with unique characteristics or job responsibilities from ever being able to "successfully establish a prima facie case (absent direct evidence of discrimination)." *Id.* at 353. Under such a narrow reading, this Court has observed,

"an employer would be free to discriminate against those employees occupying 'unique' positions." *Id.*

The three male pilots were similar to Drerup in all relevant aspects. They were: (1) hired to fly the Phenom; (2) in Drerup's hiring class; (3) subject to the same probation period; (4) subject to the same "fit test"; and, most importantly, (5) precluded from flying the Phenom because of their stature. NetJets provided a "fit test" and reassignment for the three men so they could comfortably fly, but neglected to provide the same accommodation for Drerup, even though Drerup was type-rated for the same plane to which the three male pilots were reassigned. Thus, although NetJets accommodated *men* whose height made flying the Phenom unsafe and impractical by reassigning them to a more appropriate plane, they did not provide the same accommodation to Drerup.

NetJets relies on two district court cases to argue that the comparators' physical characteristics must be similar for Drerup's discrimination claim to succeed. *See Lutz v. Ohio Dep't of Rehab. & Correction,* No. 2:10-CV-877, 2011 WL 4964977, at *4 (S.D. Ohio Oct. 19, 2011); *Ross v. William Beaumont Hosp.*, 678 F. Supp. 655, 679 (E.D. Mich. 1988). Neither case is binding. Even if they were, *Lutz* and *Ross* support the conclusion that what matters for determining whether someone is a similarly situated comparator is that their relevant physical characteristics are: (1) similar in nature; and (2) similar in their impact on job performance. *See Ross*, 678 F. Supp. at 678-79 (finding that the plaintiff, an overweight female doctor whose weight required her to lean on patients, affecting the "sterility of the operation," failed to identify similarly situated doctors in the hospital because she did not identify a "doctor [that] had a malady which threatened patients at the Hospital"); *see Lutz*, 2011 WL 4964977, at *3-5 (finding the plaintiff, a correction officer that had several disabilities that inhibited her ability to perform her job, was not

similarly situated to other correction officers with disabilities because she was less qualified for the position than the correction officer she identified as a comparator and because her disability was much more severe).  In this case, Drerup's height impacts her ability to safely and comfortably fly the plane, as was the case for the three tall male pilots.  The district court's narrow definition of "similarly situated" effectively removed Drerup from the protective reach of antidiscrimination laws; the three pilots she identifies are proper comparators.  *See Ercegovich*, 154 F.3d at 353.

### b.  Disparate Treatment

As to whether the similarly situated male pilots were treated more favorably than Drerup, we turn to Drerup's assertion of "disparate treatment."  To establish a disparate treatment claim, Drerup is only required to show that her "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin."  *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).  In "some situations," the employer's discriminatory motive can be inferred from the "mere fact of differences in treatment."  *Id.*  In this case, Drerup has furnished evidence that, as a woman whose stature prohibited her from flying a plane safely, she was treated worse than men whose stature prevented them from flying the same plane safely.  Moreover, the lack of seriousness with which Drerup's supervisors took her concerns raises serious questions, especially given that failing to perform the engine out maneuver in an emergency situation could have resulted in disastrous consequences had Drerup been able to pass the check ride test.  Drerup was treated in a noticeably different way compared to the tall male pilots, who were allowed a reassignment to a new plane early in the training process based on a "fit test" without requesting the change, and without having to prove their inability to fly the plane.

The district court opined that Drerup failed "to explain why she struggled with flying because of her height, but other small-stature female pilots are able to fly the Phenom."  (Summ.

J. Order, R. 58, Page ID # 826). However, this misses the point. Title VII does not require that *every member* of the suspect class face discrimination for a plaintiff to have a viable claim. The fact that two women with the same height as Drerup may have been able to fly the Phenom is not enough to invalidate her claims that *she* was treated differently based on her sex. Further, the fit test entailed more than a general height measurement: it also requested "[m]easurements of your body in a seated position, hip to the knee, [and] knee to the toe." (Drerup Dep, R. 45-3, Page ID # 218). Even assuming that the two women pilots identified in NetJets' reply had a stature similar to Drerup, the record contains no facts beyond their height, and without more, we cannot conclude that the two women pilots are sufficiently similar to Drerup in relevant respects.

Because Drerup correctly uses the three tall male pilots who were accommodated based on their stature as comparators for her claim, she has satisfied the similarly-situated requirement and made out her prima facie case of discrimination.

### ii. *Nondiscriminatory Reasons for Termination*

Once a plaintiff establishes a prima facie case of discrimination, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). In satisfying that burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254 (citation omitted). Instead, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* at 254-55.

NetJets' proffered legitimate non-retaliatory reasons for terminating Drerup are that: (1) Drerup had failed her check ride and chose not to continue the check ride; (2) Drerup declined

the opportunity to receive additional training to help her satisfactorily complete her check ride; (3) there were concerns regarding Drerup's demeanor during Indoc training; and (4) Drerup's flight training record showed she was able to perform all maneuvers "to standard" before the check ride. NetJets supports its reasoning through sworn affidavits, deposition testimony, personnel emails, and flight evaluation records. Thus, NetJets' proffered reasons for its termination decision are "clear and reasonably specific," and are supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus.'" *White*, 533 F.3d at 392 (quoting *Burdine*, 450 U.S. at 257-58).

### iii. Pretext

Because NetJets articulated a legitimate nondiscriminatory reason for its termination decision, we turn to the final part of the *McDonnell Douglas* analysis: Drerup's showing of pretext. Drerup must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. She can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action: (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White*, 533 F.3d at 393 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008)). "This burden is not heavy, [ ] as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual," *George v. Youngstown St. Univ.,* 966

F.3d 446, 462 (6th Cir. 2020), after drawing "all justifiable inferences" in the nonmoving party's favor, *Anderson*, 477 U.S. at 255.[5]

### a. Drerup's Training and Evaluation

Three of NetJets' proffered reasons for terminating Drerup are her: (1) failed check ride; (2) refusal to continue the check ride or receive additional training; and (3) flight training  record. NetJets argues that it had an honest belief that Drerup was able to perform all required maneuvers in the Phenom, that its expectation for her to do so was reasonable, and that her objection to continuing training and the check ride was unwarranted.

The "honest belief" rule provides that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 322 (6th Cir. 2019) (alteration in original) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (2009)).  But the "honest belief" rule is not without limits.  "[A]n employee can still overcome the 'honest belief rule' by pointing to evidence that 'the employer failed to make *a reasonably informed* and considered decision before taking its

---

[5] Because Drerup's job requires a high degree of skill, the district court placed a higher burden on Drerup to show that NetJets' termination reasons were pretextual, relying exclusively on *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977) (an "employer bears a [ ] lighter burden to show that his employment criteria are job-related" when the job requires a high degree of skill).  (*See* Summ. J. Order, R. 58, Page ID # 828–29).  However, *Boyd* found that a height requirement for pilots was not sex discrimination because it ensured the safety of the pilot. "Ample evidence in the record" showed that "an individual's ability to operate all the instruments in the cockpit and reach the design eye reference point is dependent upon an individual's height and is essential to the safe and efficient operation of a plane." *Id.* at 54.  Drerup concedes that her stature inhibited her ability to fly the Phenom safely, but any similarity with *Boyd* ends there.  In *Boyd*, the employer had no plane that could accommodate a shorter height.  *Id.* at 52-53.  By contrast, NetJets had planes that Drerup says she could fly, one of which three men were reassigned to.

adverse employment action.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998)).

NetJets was aware of Drerup's struggles during simulation training but argues that after she successfully completed her final simulation sessions, there was "no reason to believe Drerup was unable to proficiently perform any maneuver required of her in the Phenom." (Appellee Br., ECF No. 19 –20). Furthermore, NetJets learned Drerup not only failed her check ride but also refused to continue any further additional training that was offered to her, and this resistance provided NetJets grounds for termination. NetJets avers that it was unaware of any reason that Drerup would decline further training after the failed check ride. Poor job performance and refusal to continue training are indeed legitimate, non-discriminatory reasons for an employee's termination. *See Imwalle*, 515 F.3d at 546.

But NetJets' arguments are inconsistent with the record. First, during Drerup's seventh and final simulation session, on February 22, 2017, Messenger gave Drerup an unsatisfactory evaluation on her FSI evaluation, concluding that "Shari's stature precludes attaining sufficient control authority." (Messenger Dep. R. 45-4, Page ID #319). Messenger contacted Lambert to advise him that Drerup was too short for the Phenom and Lambert advised Messenger that he would sit in a simulation to observe Drerup's difficulty in reaching the rudder pedals. Both Lambert and Messenger then observed Drerup's difficulty in obtaining rudder control. Lambert then informed the NetJets training department of Drerup's issues completing the maneuver, and NetJets authorized more training. Drerup subsequently made Queen aware of her inability to fly the Phenom due to her short stature by directly telling him; Queen then provided advice as to how to overcome her short stature, such as by using a pillow and platformed shoes. Moreover, Eastman testified that a pilot must be graded proficient in all maneuvers to be recommended for a check

ride, and that a rating of "3" is unusual and requires a report to the union. Drerup received twelve ratings of "3" during her simulation training, which would have been reported to the union and brought to NetJets' attention. The record simply does not support an assertion that NetJets was unaware of any issues that may prevent Drerup from passing her check ride. At a minimum, Drerup has provided enough evidence for a reasonable juror to conclude that NetJets' purported ignorance of her performance was pretextual. *See Youngstown*, 966 F.3d at 462.

NetJets' argument that Drerup's refusal to continue training constituted grounds for termination is equally unavailing. Drerup has provided evidence that continuing training would have been futile; no amount of training would add inches to her legs. Drerup made this concern known to Lambert, Queen, and Messenger. And if Drerup had manipulated her stature enough to pass the check ride, that would raise larger concerns. A reasonable juror could easily conclude that Drerup's refusal to continue to fly a plane that she was incapable of flying due to her stature was the only responsible decision she could make. Instead, Drerup's concerns were disregarded, whereas her male comparators were reassigned to a new plane after the fit test without having to demonstrate discomfort while flying the Phenom. Drerup has provided enough evidence that a reasonable juror could conclude that NetJets' insistence on additional training and the continuation of the check test was unreasonable and pretextual. *Matsushita*, 475 U.S. at 587.

### b. Drerup's Demeanor

During Indoc training, two NetJets employees expressed concerns about Drerup's demeanor to Kennedy, the Director of Training. The comments were not officially reported during or immediately after Indoc training, and they did not prevent Drerup from proceeding to the next phase of the course; she passed the necessary tests and graduated from Indoc training. Rather, the concerns were purportedly documented on February 28, 2017, the same day Kennedy

recommended that Drerup be terminated and the day before Drerup received her termination letter. A reasonable juror could infer that if NetJets honestly believed the alleged attitude problems to be true or a terminable offense, it would have addressed the issue earlier, not two months after the completion of the training course, where significant resources had been expended. A reasonable juror could find that the emails were simply NetJets' attempt to justify Drerup's discriminatory termination.

### c. *Shifting Explanation*

Drerup argues that that NeJets' reasons for terminating her employment have changed over time. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996). On this front, Drerup's argument is unavailing. At the time of Drerup's termination, NetJets provided that she was terminated based on the "failure to successfully complete [her] probationary period." (Termination Letter, R. 52-11, Page ID # 781). As described on appeal, NetJets' reasons for termination are more detailed than as described in Drerup's termination letter, but they have remained consistent, and Drerup has failed to identify any material changes. NetJets' explanation may well be pretextual, but it is not "shifting."

Thus, because Drerup correctly identifies as comparators the three male pilots who were accommodated based on their stature, Drerup satisfies the similarly-situated requirement and has established a prima facie discrimination case. Further, Drerup has furnished enough evidence to establish a genuine dispute of material fact with regard to whether NetJets' offered reasons for her termination were pretextual. *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 572 (6th Cir.

2003) ("[T]he widely differing perspectives on whether . . . a discriminatory motivation [exists] provide a classic example of a genuine issue of material fact."). Summary judgment was improper.

### 2. Mixed Motive Sex Discrimination Claim

The district court held that Drerup abandoned her mixed motive claim because she did not address it in her opposition to summary judgment. As a reminder, Drerup's amended complaint alleges that "NetJets discriminated against Plaintiff because of her sex in violation of 42 U.S.C. § 2000e-2(a)(1) and/or sex was a motivating factor in Defendant NetJets' decision to terminate Plaintiff's employment in violation of 42 U.S.C. § 2000e-2(m)." (Am. Compl., R. 7, Page ID # 33).

The mixed motive framework applies in cases "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives." *Wexler*, 317 F.3d at 571 (citation omitted). Drerup can proceed on a mixed motive claim by demonstrating that her sex was a motivating factor in her termination, even though other factors also motivated her discharge. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711-13 (6th Cir.2006). "[T]he ultimate question at summary judgment on a mixed motive case is 'whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that [a protected characteristic] was *a motivating* factor in [the defendant's adverse employment action against the plaintiff]."[6] *Id.* at 713 (alterations in original) (quoting *Harris v. Giant Eagle, Inc.*, 133 F. App'x 288, 297 (6th Cir. 2005)).

---

[6] A different burden-shifting framework applies to mixed-motive claims, where "[o]nce the plaintiff has shown that the unfavorable employment decision was made at least in part on a discriminatory basis, the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same adverse action even if impermissible factors had not entered into its decision." *Wexler*, 317 F.3d at 571.

A mixed-motive analysis is triggered only if a plaintiff gives notice of such a claim. The record cannot be "utterly silent as to mixed motives." *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (quoting *Hashem-Younes v. Danou Enters. Inc.,* 311 F. App'x 777, 779 (6th Cir. 2009)). Here, the record was not silent: Drerup included her mixed motive claim in her complaint. Nor is she required to respond to the absence of an argument against her claim to maintain her cause of action. "[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). Rather, the moving party "always bears the burden of demonstrating the absence of a genuine issue as to a material fact," and the district court is required "to examine the movant's motion for summary judgment to ensure that he has discharged that burden." *Id.* at 454-55; *see* Fed. R. Civ. P. 56(a). Drawing "all inferences in the light most favorable to the non-moving party," and given that NetJets' motion for summary judgment *made no argument* as to Drerup's mixed motive claim, we find that the claim remains. *See Matsushita*, 475 U.S. at 587. The district court erroneously expected Drerup to oppose an argument that NetJets never made.

### III.    CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's judgment as to both the single and mixed motive claims, and **REMAND** for trial.

**McKEAGUE, Circuit Judge, dissenting.** I respectfully dissent. Assuming, *arguendo*, that Drerup established a prima facie case, judgment for NetJets was still proper as Drerup failed to offer evidence such that a reasonable juror could reject NetJets' proffered reasons for firing her. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251–52 (6th Cir. 2023) (proceeding to the pretext analysis without determining whether the plaintiff established a prima facie case).

NetJets provided four reasons for Drerup's termination: "(1) she failed her check ride and chose not to continue; (2) she declined the opportunity for additional training designed to help her pass the check ride; (3) NetJets employees raised concerns regarding Drerup's demeanor during initial classroom training; and (4) her flight training record demonstrated she struggled significantly during flight simulator training." Appellee's Br. at 2. Drerup does not dispute that these are legitimate, nondiscriminatory reasons for terminating a person's employment. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment and, by articulating such a reason, [a defendant meets] its initial burden under the *McDonnell Douglas/Burdine* framework."); Appellant's Br. at 30. Thus, the burden is on Drerup to prove by a preponderance of the evidence that the "reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

To establish that NetJets' reliance on her failures during training and the check ride was pretext, Drerup repeatedly claims that that she is unable to fly the Phenom due to her stature, *see, e.g.*, Appellant's Br. at 38 ("There is nothing honest in NetJets alleged belief that Appellant was capable of operating the Phenom."), implying that NetJets' concerns lack a factual basis or were insufficient to motivate Drerup's termination. But when an employer has an honest belief in their

proffered reason for taking adverse employment action, and such belief arises "from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009) (citing *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009)); *see also Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Accordingly, what NetJets knew when it fired Drerup is crucial.

NetJets knew that Drerup struggled with the engine out maneuver, and failed her February 22, 2017, simulation session. But, *after* that failed simulation:

- Jim Queen, NetJets' Senior Director of Training, called Drerup to discuss techniques that could help her satisfy the rudder requirements, including wearing shoes with a larger sole, using a pillow in her seat, and a technique that involved the placement of her feet at the time the engine goes out.

- Following that conversation with Queen, Drerup purchased new shoes and procured pillows.

- Drerup received two extra training sessions to focus on passing the engine out maneuver. At both sessions she received passing scores and completed the engine out maneuver. Leon Lambert, another pilot brought in to fly with Drerup during the additional sessions, helped Drerup find seat positions that, according to Messenger and Leon, contributed to Drerup's success in completing the engine out maneuver.

- After successfully completing those additional sessions, Drerup was recommended for her check ride.

- At her check ride, Drerup failed the engine out maneuver.

- After failing the engine out maneuver, Drerup declined to continue the test in attempt to pass the other maneuvers.

- Drerup declined NetJets' offer for additional training.

Thus, although NetJets was aware that Drerup initially had difficulty completing the engine out maneuver, NetJets intervened to provide extra assistance to Drerup so that she could successfully complete the engine out maneuver. At the time NetJets terminated Drerup's employment, it had received a report that Drerup successfully completed the engine out maneuver in her extra

simulations, yet she failed to complete the maneuver on test day and subsequently declined to continue the test or complete additional training. Thus, NetJets' belief that Drerup was capable of flying the Phenom and passing her check ride will not be deemed pretextual even if it was erroneous. *See Upshaw*, 576 F.3d at 586.

NetJets also contends that it was motivated to terminate Drerup's employment in part due to concerns about her demeanor. In support of this justification, NetJets relies on Drerup's refusal to complete additional training or continue with her check ride. NetJets also references reports by two employees who recalled negative interactions with Drerup during her initial training. At NetJets' request, these employees documented their negative experiences the day before NetJets fired Drerup. According to Drerup and the majority, the timing of the allegations could lead a reasonable juror to find that the allegations were "fabricated and elicited to paper the file." Appellant's Br. at 21; Maj. Opn. at 22. But even when a plaintiff believes timing is suspicious, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)); *see also Goldblum*, 62 F.4th at 256. Since Drerup fails to provide additional evidence of pretext, the timing of these reports about Drerup's attitude "cannot alone prove pretext." *Goldblum*, 62 F.4th at 256 (citation omitted); *cf. Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998) ("The doubt raised over Chrysler's second alternative justification for firing Smith does not translate into an inference that the true motivation behind Smith's discharge was his disability.").

Because Drerup has not rebutted that her refusal to continue with the check ride or to accept further training, in combination with perceived attitudinal issues, led to her termination, she has not met her burden of establishing pretext. *See Conley v. City of Findlay*, 266 F. App'x 400, 406 (6th Cir. 2008) ("But none of these complaints, if assumed to be true, demonstrate that the City's

reason for terminating Conley lacked a factual basis, failed to motivate its decision to terminate her, or were insufficient to motivate her discharge."); *Burks v. Yellow Transp., Inc.*, 258 F. App'x 867, 875 (6th Cir. 2008) ("As in *Wright* [*v. Murray Guard, Inc.*, 455 F.3d 702, 709 (6th Cir. 2006)], Burks "has offered no evidence to indicate that [the defendant] made its decision on grounds other than those offered."). Thus, summary judgment for NetJets was proper.

The majority further concludes that the district court erred in finding Drerup's mixed motive claim abandoned. Maj. Opn. 23–25. But because there is no evidence that NetJets did not honestly believe its proffered reasons for firing Drerup or that NetJets relied on unlawful motives when it fired her, I would find any error in failing to reach the mixed motive claim harmless. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 714 (6th Cir. 2006); *Williams v. Zurz*, 503 F. App'x 367, 376 (6th Cir. 2012).

For these reasons, I respectfully dissent and would affirm.